John M. DIMIDOWICH, dba Micro Image, Plaintiff,

v.

BELL & HOWELL; Does I through XX, Defendants.

No. CV S 82–1086–EDP.

United States District Court, E.D. California.

April 19, 1984.

Robert F. Koehler, Jr., Sacramento, Cal., for plaintiff.

Lynn H. Pasahow, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., L. Burda Gilbert, Weintraub, Genshlea, Hardy, Erich & Brown, Sacramento, Cal., for defendants.

## MEMORANDUM DECISION AND ORDERS

PRICE, District Judge.

Plaintiff brings this action alleging multiple trade-restraint types of causes of action. Presently pending before the Court is plaintiff's motion for a mandatory temporary injunction and the parties' cross-motions for summary judgment.

The facts underlying this action are relatively simple and are generally not in dispute.

Bell and Howell (hereinafter defendant) manufactures, distributes, sells and services micro-imagery products. Among all of the producers of such goods, defendant occupies a position of third place in the domestic market, behind Minnesota Mining and Manufacturing Co. (3M) and Kodak. Unlike some of its competitors, defendant refuses to sell replacement parts for its equipment except through its own service organization or directly to an owner-user of defendant's products. Except as an incidental result of their parts sales policy, defendant does not require a purchase of defendant's machines to agree to allow them to be serviced by defendant's service organization.

Plaintiff formerly worked for defendant as a service man. He left their employ several years ago and established his own business, which includes servicing micro-imagery equipment, including that manufactured by defendant. Plaintiff owns and uses some machines manufactured by the defendant.

Plaintiff bid competitively for service contracts with certain California state agencies in 1981, as well as non-governmental customers. Among the bid competitors was the defendant. Plaintiff was awarded the contract to service all of the micro-imagery equipment of several such state agencies, including that of the defendant's manufacture. In addition, plaintiff services such equipment for non-public entities.

Promptly upon entering into the contracts with the State entities, plaintiff sought to procure an inventory of replacement parts from defendant, which order was rejected by the defendant. Upon filing this suit in State court, and pending plaintiff's application there for a mandatory temporary restraining order, the parties compromised their differences temporarily. In exchange for plaintiff dropping his application for a temporary restraining order, defendant supplied plaintiff with certain of the parts requested. Plaintiff now complains that such parts inventory is at or near exhaustion, and his ability to continue his contracts is dependent upon establishing a quick, reliable source for critical replacement parts for defendant's brand equipment. The only such source, of course, is the defendant.

The evidence is clear that defendant's policy regarding parts has the effect of preventing independent service organizations, such as plaintiff's, from competing with defendant's service organization. One exception is Micro-Designs, an organization located near Fort Worth, Texas, and much like that of defendant's in goods and services offered, has apparently replaced defendant as the service agency of choice by several "major" accounts.[1] Micro-Designs also owns and uses defendant's machines. When first refused ordered parts by defendant's offices in Chicago, representatives of Micro-Designs called upon defend-

---

1. A "major" account, by definition in the record, is an account which possesses ten (10) ma-chines.

ant's employees in charge of defendant's Irving, Texas Office. They explained to defendant's employees that they needed the requested parts to service their newly acquired contracts as well as their own machines. A subsequent letter from Micro-Designs to one of defendant's employees (who was a party to the above conversation) contains carefully chosen and crafted words and phrases that would suggest that the parts were to be used on their own machines.

Defendant knowingly departs from its strict adherence to its parts policy in two instances.

First, in order to service the sparsely populated area of the Southwestern United States, the defendant has contracted with Micro-Graphics to act as its exclusive service representative in the designated area.[2] Within this area, defendant's service agencies do not compete with Micro-Graphics; outside the area, Micro-Graphics does not compete with defendant for service work on defendant's branded products.[3] Micro-Graphics is under no contractual arrangement with defendant that requires Micro-Graphics to adhere to defendant's policy.

Early on in this litigation, plaintiff sought to procure the necessary parts to service defendant's products from Micro-Graphics. Micro-Graphics refused, ostensibly on the grounds that it was forbidden by contract, to do so. After consultation with defendant's officers in Chicago, and learning that no such contractual prohibition existed, Micro-Graphics based its refusal on internal business reasons.

The second area of deviation by defendant from its parts policy occurs when a large purchaser and user of its equipment indicates a desire to create an in-house service department. In such a case, the defendant will furnish such a large customer service and technical manuals, advise the customer as to what parts to put in a permanent inventory, and in some instances, provide training assistance for its service personnel. There is no indication that such organizations are contractually forbidden by the defendant to sell their inventory of parts to others; nor is there any evidence that any would desire to do so.

Defendant's business reasons by which it justifies its parts policy can best be understood if addressed by its component parts.

*Cost* —Defendant's expenditures for the maintenance of its service department approximates $10,000,000 per year. This cost includes the constant maintenance of a complete parts inventory for parts that are not mass produced—some units in the product mix under consideration number only in the hundreds in actual use and in need of service. Further, some items of inventory must necessarily be maintained in all area offices, based on defendant's sophisticated and ongoing inventory control system, in order for the service organization to function efficiently, to maximize customer satisfaction and minimize down time. If these parts were available to anyone who possessed the technical skills to service the machines, this cost factor, as it relates to the inventory-maintenance function, would inure to the benefit of the independent operator and to the detriment of the defendant, since the independent operator would have no incentive to carry other than a minimal inventory.

*Promptness* —Speed of repair of a customer's inoperative equipment is a prime concern of defendant's service organization. If the parts inventory in both the area offices and the central warehouse were being depleted by random, unpredictable orders, the ability of the defendant to respond promptly in cases of equipment breakdown would be impaired.

*Customer Satisfaction* —Defendant is concerned that customer dissatisfaction, arising from improperly performed mainte-

**2.** The designated area is generally Western Texas and the Southwestern United States, including parts of Nevada.

**3.** Micro-Graphics sells and services other brands of micro-imagery equipment both in and out of the designated area contained in the above-mentioned contract. They do compete in these areas.

nance and repair will adversely reflect upon the defendant's product, and that the customer, not being aware of the true cause of his displeasure, will be lost as a potential customer of the defendant. Worse yet, such a scenario may turn the disgruntled customer into a plaintiff in a products liability action. Defendant's method of solving this problem, of course, is its parts policy and the maintenance of its service organization.[4] Defendant's policy in this regard is so carefully adhered to that defendant reserves the right not to service or repair any used equipment bearing its label that is sold by dealers in used merchandise, or defendant's products that have been modified or altered.

*Technical Advances*—As technical advances are made in the field of micro-imagery, defendant not only attempts to keep pace, but to pass these on to the users of its machines as fast as possible. Frequently this is done without cost to the consumer through the manufacturer directed and oriented service organization.

Clearly, the foregoing business reasons advanced by the defendant are not without a logical basis. The fact that one customer produced by the plaintiff is not enchanted with this policy hardly speaks for the market. It is not for the Court to pass subjective judgment on the wisdom underlying such policies, but to note that in pursuit of the same, defendant has captured between 10% and 14% of the domestic market for the products under consideration.

In the course of the hearing on plaintiff's earlier application for a temporary restraining order, the Court questioned plaintiff's counsel about the adequacy of money damages to compensate plaintiff's counsel should defendant's actions cause plaintiff to lose the public entity contracts. Prior to the first evidentiary hearing on the motion for a temporary injunction, plaintiff filed the affidavit of John Babich to the effect that plaintiff's failure to adequately perform his State contracts could result in his being removed from the eligible bidder list,

and thus precluded from future bidding. Defendant's counsel objects, indicating that such filing was untimely. The Court received the affidavit subject to defendant's motion to strike.

The parties have engaged in extensive discovery, and the Court has reviewed the same in preparation for deciding the motions presently pending before it.

The testimony reveals that the plaintiff and his employees have been quite resourceful in obtaining the necessary parts to service the Bell & Howell products that are covered by the maintenance service agreements that plaintiff has entered into. These tactics consist of cannibalizing other equipment, obtaining parts from the original source, or, alternately, purchasing the parts from Micro-Designs. Such practice, of course, is not reliable as would be the ability to obtain the parts directly from Bell & Howell.

At the commencement of the hearing on plaintiff's Motion for Preliminary Injunction, plaintiff's counsel orally announced that his first, second, third, fifth, and seventh causes of action would be dismissed with prejudice. The Court entered its formal written order effective December 5, 1983, on January 4, 1984. We now consider plaintiff's remaining causes of action.

### The Cross-Motions for Summary Judgment

#### A. *Plaintiff's Fourth Cause of Action.*

■ Plaintiff's fourth cause of action is brought under the provisions of the California Cartwright Act, *i.e.*, California Business and Professions Code, § 16720, et seq. As has been noted by the California Supreme Court, the antitrust provisions of this Act were patterned after the Sherman Antitrust Act. *See Corwin v. Los Angeles Newspaper Service Bureau, Inc.*, (1971) 4 Cal.3d 842, 94 Cal.Rptr. 785, 484 P.2d 953. The California Supreme Court has held that the federal cases interpreting the Sherman Act are authoritative in cases under the

---

**4.** Defendant offered no evidence, and plaintiff's counsel made no inquiry, as to defendant's at-

tempts, if any, to condition its warranty liability upon authorized maintenance and service.

Cartwright Act. *See Chicago Title Ins. Co. v. Great Western Financial Corp.* (1968) 69 Cal.2d 305, 70 Cal.Rptr. 849, 444 P.2d 481. Specifically, plaintiff claims the conspiracy and/or combination to restrain trade exists between the defendant and Comgraphix resulting from Bell & Howell's policy concerning their sale of replacement parts for their micrographic equipment. Plaintiff further claims that this conspiracy combination results in an attempt to monopolize the market, and in fact, has done so. As was stated in *Davis-Watkins Co. v. Service Merchandise*, 686 F.2d 1190, 1195–1196 (6th Cir.1982):

> To establish a claim under section 1, the plaintiff must establish that the defendants contracted, combined or conspired among each other, that the combination or conspiracy produced adverse, anticompetitive effects within relevant product and geographic markets, that the objects of and conduct pursuant to that contract or conspiracy were illegal and that the plaintiff was injured as a proximate result of that conspiracy.

Defendants, by affidavit and direct testimony, have introduced substantial credible evidence that the decisions not to deal with the plaintiff made by the defendant Bell & Howell and Comgraphix independently were based on different reasoning. The rule in this circuit is: "Once the allegations of conspiracy made in the complaint are rebutted by probative evidence supporting an alternative interpretation of a defendant's conduct, if the plaintiff then fails to come forward with specific factual support of its allegations of conspiracy, summary judgment for the defendant becomes proper." *ALW, Inc. v. United Air Lines, Inc.*, 510 F.2d 52, 55 (9th Cir.1975). Not only did plaintiff fail to introduce evidence supporting the allegations of the fourth cause of action of the complaint, but the only evidence which plaintiff produced on this point tends to substantiate the reasons given by Comgraphix for their refusal to sell Bell & Howell parts to the plaintiff.

Because plaintiff's total failure to demonstrate that the defendant Bell & Howell was engaged in concerted action with any other person, plaintiff's Fourth Cause of Action cannot stand.

B. *Plaintiff's Sixth Cause of Action.*

■ Plaintiff's Sixth Cause of Action attempts to state a claim for relief on the theory that Bell & Howell's practices constitute a "tying" arrangement. Specifically, plaintiff alleges that Bell & Howell will sell replacement parts only on the condition that the buyer have purchased its equipment directly from Bell & Howell, and that Bell & Howell will sell its replacement parts only on condition that the buyer buy Bell & Howell services and repairs.

The defendant's evidence in this regard is overwhelming. It is true, as the Court noted earlier in this Memorandum Decision, that Bell & Howell's policy is restrictive as to whom it will sell replacement parts. Its policy does not require the purchaser of the replacement parts to buy any other product as a condition of obtaining such parts. As previously stated, Bell & Howell's condition for the sale of replacement parts for its equipment is only that the replacement parts be used on Bell & Howell equipment owned by the purchaser.

In effect, Bell & Howell's policy in this regard does have the natural tendency to reduce the number of persons who might repair Bell & Howell equipment and hence, restricts competition in that area.

Having found that defendant's refusal to deal did not constitute an illegal "tying" arrangement, however, does not end our inquiry. The central issues in this case is whether or not the law requires one engaged in business to deal with all comers; or, stated conversely, is a unilateral refusal to deal with potential competitor illegal? In *Bushie v. Stenocord Corp.*, 460 F.2d 116 (9th Cir.1972), the Ninth Circuit reaffirmed its prior holding that a manufacturer has a natural monopoly over its own products, especially when the products are sold under a trademark. The Court went on to state, at page 120: "Unless the manufacturer used his natural monopoly to gain control of the relevant market in which his

products compete, the antitrust laws are not violated." [5]

■ Finally, the Court notes that unilateral refusal to deal must result in a stifling of competition within the relevant market. The relevant market in this case, of course, is the market in which the plaintiff is engaged, namely, the service and repair of *all* micrographic equipment. Bell & Howell, on the other hand, only affects the market in which it is engaged, namely, the repair of Bell & Howell equipment. The evidence is not clear that the repair of Bell & Howell equipment constitutes a significant portion of plaintiff's business.[6] Thus, even though the action of Bell & Howell has the natural tendency to monopolize the servicing of Bell & Howell equipment, it does not constitute an illegal restraint under the authorities.[7] Accordingly, the plaintiff's Sixth Cause of Action must fail.

### C. *Plaintiff's Eighth Cause of Action*

■ Plaintiff bases his Eighth Cause of Action on the California Business & Professions Code, § 17040, which reads as follows:

It is unlawful for any person engaged in the production, manufacture, distribution or sale of any article or product of general use or consumption, with intent to destroy the competition of any regular established dealer in such article or product, or to prevent the competition of any person who in good faith, intends and attempts to become such dealer, to create locality discriminations.

However, § 17042 of the same Code specifically provides:

Nothing in this chapter prohibits any of the following:

(a) A selection of customers.

(b) A functional classification by any person of any customer as broker, jobber, wholesaler or retailer.

(c) A differential in price for any article or product as between any customers in different functional classifications.

Since selecting one's customers necessarily entails the rejection of customers, it follows that defendants' practice here is excepted from the operation of the California Unfair Competition statutes.

### D. *The Plaintiff's Ninth, Tenth and Eleventh Causes of Action*

■ Plaintiff's Ninth Cause of Action is based on an alleged violation of California Business & Professions Code, § 17047: "It is unlawful for any manufacturer, wholesaler, distributor, jobber, contractor, broker, retailer, or other vendor, or any agent

---

5. Plaintiff's counsel would argue that the *Bushie* case and others cited by the defendant are not applicable because they are "distributorship" cases. In footnote 1 of that case, page 118, indicates that *Bushie*, as plaintiff does here, urged upon the court that separate consideration should be given to the servicing aspects of *Bushie's* enterprise. Indeed, the Court noted: "Bushie argued that the sales and servicing aspects of his business should be considered separate enterprises for the purposes of analysis under the Sherman Act. We have concluded that, even if they are so regarded, the same principles apply to each and that the conclusions we reach are common to both aspects."

6. The impact of diminished competition is measured at the consumer level; *i.e.,* the owners of machines being served, rather than the organization servicing the machine. Some of plaintiff's evidence created the inference that Bell & Howell "lost" potential equipment purchasers because of their restrictive policy re sale of replacement parts. This, of course, would

tend to *increase* plaintiff's competitive stance by creating more potential customers.

7. Plaintiff argues correctly that most of the cases in this area involve cases wherein a distributor has been terminated by his supplier. The conclusion of his syllogism, *i.e.,* that these are therefore not applicable here does not follow.

Those cases are founded on two fundamental principles:

1. Absent improper motive or effect, a producer of goods can choose his own customers without fear of liability.

2. It is the policy of the law, and to the general benefit, to enable producers of goods to develop strong and efficient distributorship systems.

Logical application of these principles requires the conclusion that the manufacturer can, in effect, choose itself as the sole distributor of its own goods consistent with these principles, absent impermissible methods and effects.

of any such person to solicit any violation of this chapter."

The Tenth Cause of Action is based on an alleged violation of § 17046, California Business & Professions Code, which reads as follows: "It is unlawful for any person to use any threat, intimidation, or boycott, to effectuate any violation of this chapter."

Finally, plaintiff's Eleventh Cause of Action is based on § 17048, of the same Code: "It is unlawful for any manufacturer, wholesaler, distributor, jobber, contractor, broker, retailer, or other vendor, or any agent of any such person, jointly to participate or collude with any other such person in the violation of this chapter."

The legislative thrust of these sections, of course, is the prohibition of price discrimination as between various locations in which an alleged offender may be doing business. As previously pointed out, the selection of a customer, without more, does not result in a violation of the Act.

The Court should note that it is well aware of the repeated statements regarding the danger of granting summary judgments in antitrust cases. Indeed, in considering a recent case from this very district, the Circuit Court had occasion to observe:

> Of course, "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles ...." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *Chisholm Brothers Farm Equipment Co. v. International Harvester Co.*, 498 F.2d 1137, 1139 (9th Cir.), *cert. denied*, 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974) (*Chisholm Brothers*). Nevertheless, if there is no genuine issue of material fact, and if the resisting party does not present a record sufficient to support a reasonable finding in his favor, a district court has a duty to grant the motion for summary judgment.

*See Filco v. Amana Refrigeration, Inc.*, 709 F.2d 1257, 1260 (9th Cir.1983).

A word should be said about the procedural history of this case, because it bears directly upon the time available to plaintiff's counsel to meet the challenge of this summary judgment. Defendants' original motion for summary judgment was filed and set for hearing on August 1, 1983. Plaintiff's opposition thereto was not timely filed under the Local Rules, and upon inquiry, plaintiff's counsel complained that he had not had sufficient time to respond to the same. The Court continued the hearing on defendants' motion for summary judgment approximately two months, setting the next argument on October 3, 1983.

On September 27, 1983, plaintiff's counsel filed a notice of plaintiff's countermotion for summary judgment, and calendared the same for hearing simultaneously with the pending defendants' motion for summary judgment.

Plaintiff's counsel next filed a motion for leave to file an Amended Complaint on September 30, 1983. The Court thereupon ordered a Status Conference in the matter to attempt to restore some regularity to the proceedings. The Court accordingly vacated all calendar dates, and set the matter down for Status Conference on November 7, 1983, including argument on plaintiff's motion to amend.

In the meantime, plaintiff's counsel filed a noticed motion for a temporary restraining order and preliminary injunction.[8] The hearing on the application for the temporary restraining order was held on November 1, 1983, and denied. At the November 7, 1983, Status Conference, the Court heard arguments on plaintiff's motion to file an amended complaint, which was denied. The Court then established a briefing and hearing agenda on the further pending motions. The hearing on the motion for preliminary injunction was had on December 5, 1983, and January 20, 1984.

Although given over six months to do so, in the Court's opinion, plaintiff's counsel has totally failed to submit to the Court

---

**8.** The Court notes that plaintiff's original complaint, filed in Sacramento Superior Court in December, 1981, contained a prayer for a Temporary Restraining Order and Preliminary Injunction. As indicated, it was not pursued until nearly two years later.

any legal authority for the position which he takes, namely, that the activity of the defendant is illegal *per se* or illegal under the rule of reasonableness. Plaintiff's counsel has totally failed to produce any evidence as to what is the relevant market.[9]

Based on the foregoing, it is the Court's opinion that defendants' motion for summary judgment should be granted.

### Plaintiff's Motion for a Preliminary Injunction

The foregoing discussion of this case clearly demonstrates that the plaintiff has not established his entitlement to injunctive relief. Accordingly, plaintiff's motion for preliminary injunction is denied.

### The John Babich Declaration

Prior to the hearing on the plaintiff's motion for preliminary injunction on December 5, 1983, plaintiff's counsel filed an affidavit with the Court in support of his motion for preliminary injunction. The affidavit was signed and sworn to by John S. Babich, Deputy Director of the Department of General Services in charge of the Office of Procurement for the State of California. Mr. Babich indicated that if a person defaults on a service contract with the State of California, that one of the alternatives available to the procurement office is to remove the defaulting party as a prospective bidder for future contracts. Nowhere in Mr. Babich's affidavit does it appear why he was unable to personally testify, either at the December 5, 1983 hearing, or at the continued hearing on January 20, 1984. Accordingly, counsel for the defendants moved to strike the affidavit. The Court denies defendants' motion to strike the affidavit. In view of the Court's ruling, the Court has inferentially determined that although plaintiff may not theoretical-

ly be compensated adequately by monetary damages, that the plaintiff's showing to date does not entitle him to any relief, monetary or otherwise.

For all of the foregoing reasons, it is the order of the Court that:

1. Defendant's motion for summary judgment is granted.

2. Plaintiff's motion for summary judgment is denied.

3. Plaintiff's motion for a mandatory Preliminary Injunction is denied.

4. Defendant's counsel shall prepare and lodge with the Court, pursuant to the Local Rules of Practice in this District, a formal judgment consistent with this Memorandum Decision within twenty (20) days of this date.

---

9. In his moving papers and at oral argument, plaintiff has consistently contended that the relevant market is "Northern California," yet, a review of the depositions indicates that while defendant operates in most, if not all, of the 50 states of the United States as well as foreign countries, the plaintiff's operations are confined to an area immediately surrounding the City of Sacramento, and encompasses localities in five or six counties at the most. Further, as the

Court has noted previously, the defendant Bell & Howell by its policies, in effect, created an almost complete monopoly in the sale of Bell & Howell replacement parts. Since Bell & Howell only has 10% to 14% of the national market in microimagery products, it is incumbent upon the plaintiff to show what degree of market power Bell & Howell maintains in the market in which he is competing with them.