[Civ. No. 43082. First Dist., Div. Two. May 11, 1979.]

THE PEOPLE EX REL. JOSEPH FREITAS, JR., as District Attorney, etc., et al., Plaintiffs and Appellants, v.
CITY AND COUNTY OF SAN FRANCISCO et al.,
Defendants and Respondents;
RICHARD B. SPOHN, as Director, etc.,
Intervener and Appellant.

914

**COUNSEL**

Joseph Freitas, Jr., District Attorney, Judith D. Ford, Raymond T. Bonner, David C. Moon, Gary G. Devine and Maria P. Rivera, Assistant District Attorneys, for Plaintiffs and Appellants.

Harry M. Snyder and Luana Martilla as Amici Curiae on behalf of Plaintiffs and Appellants.

Richard A. Elbrecht, Steven M. Fleisher and A. Paul Griebel for Intervener and Appellant.

George Agnost, City Attorney, and Edmund A. Bacigalupi, Deputy City Attorney, for Defendants and Respondents.

**OPINION**

ROUSE, J.—Plaintiffs appeal from a judgment on the pleadings entered in favor of defendants City and County of San Francisco and its board of supervisors (hereafter City and Board). We are asked to decide whether the provisions of the Cartwright Act apply to the City and whether San Francisco has the authority, under the California Constitution, to set taxicab fares.

The instant action was initiated by the District Attorney of the City and County of San Francisco (hereafter District Attorney), who filed an antitrust complaint for injunction, civil penalties and other equitable

relief. Permission to intervene was then granted to Richard Spohn, Director of the California Department of Consumer Affairs. Intervener's complaint was identical to that filed by the District Attorney, except that it added an eighth cause of action. The judgment on the pleadings was granted as to the first cause of action of both complaints and as to the eighth cause of action of the complaint in intervention.[1]

The first cause of action alleged a per se violation of the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.) by defendants' fixing of taxicab fares. The eighth cause of action in intervener's complaint alleged that defendants City and Board had no lawful authority to set and fix taxicab fares, and that the section of the San Francisco Municipal Code under which they purported to act is ultra vires and void.

The following facts were established by plaintiffs' request for admissions and defendants' response thereto: The Board fixes the fares which all taxicab companies operating in San Francisco must charge. Since January 1971, Yellow Cab has submitted five requests for fare increases to the Board. Although an increase was granted in response to all five requests, defendants denied that the fare was set at the level requested by Yellow Cab in every instance.

Plaintiffs'[2] first four arguments on appeal are all based on the presumption that federal case law under the Sherman Anti-Trust Act (hereafter Sherman Act; 15 U.S.C.A. 1) should be followed in this case.[3] They reason that since cases interpreting the Sherman Act are applicable to the California Cartwright Act (*Marin County Bd. of Realtors, Inc.* v. *Palsson* (1976) 16 Cal.3d 920, 926 [130 Cal.Rptr. 1, 549 P.2d 833]), recent changes in the federal law compel the conclusion that San Francisco is not exempt under the Cartwright Act.

---

[1]All counts of plaintiffs' complaint relating to defendants City and Board were decided by the trial court; therefore, the one final judgment rule permits this appeal. (6 Witkin, Cal. Procedure (2d ed. 1971) Pt. I, § 42, p. 4057.)

Summary judgment for defendants was granted as to the third cause of action; however, this decision is not being appealed. The second, third, fourth, fifth, sixth and seventh causes of action do not run against the City or the Board and are therefore irrelevant to this appeal.

The portion of this action concerning Westgate California Corporation, Yellow Cab Company and Charles O'Connor were stayed by pending bankruptcy proceedings; as a result of these proceedings, the action against Yellow Cab was dismissed without prejudice.

[2]The District Attorney filed a written brief on appeal. Intervener adopts and joins in all arguments in District Attorney's brief.

[3]An amicus curiae brief filed on behalf of Consumers Union of United States, Inc. and the Gray Panthers of San Francisco takes essentially the same position as plaintiffs.

Defendants' major argument is that *Widdows* v. *Koch* (1968) 263 Cal.App.2d 228 [69 Cal.Rptr. 464], controls in this case. That case held that municipalities were not "persons" under section 16702 of the Business and Professions Code and therefore were not subject to the provisions of the Cartwright Act (p. 235). Defendants also contend that even though the Sherman Act cases are applicable, they can be distinguished from this case. Finally, they rely upon *In re Martinez* (1943) 22 Cal.2d 259 [138 P.2d 10], which held that a municipality has the power to set taxicab rates for taxicabs operating within its boundaries.

The first question to be addressed, then, is whether federal antitrust cases have any relevance in determining whether a city has liability under the California Cartwright Act. Our analysis of the federal cases and California law leads us to conclude that, in this limited instance, federal case holdings provide no guide to the interpretation of California antitrust law. Accordingly, plaintiffs' contention that federal law is pertinent to this case must fail.

In *Parker* v. *Brown* (1943) 317 U.S. 341 [87 L.Ed. 315, 63 S.Ct. 307], the United States Supreme Court held that federal antitrust laws were not intended by Congress to apply to state action. The court reasoned that there was "nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." (Pp. 350-351 [87 L.Ed. p. 326].) It was pointed out that although previous cases had held that a state could sue under the federal antitrust laws, the legislative history of the act indicated that it prevented only " 'business combinations.' " (P. 351 [87 L.Ed. p. 326].) The act "must be taken to be a prohibition of individual and not state action." The state, acting as sovereign, is not prohibited by the Sherman Act from imposing a restraint as an act of government. (P. 352 [87 L.Ed. p. 326].)

*Goldfarb* v. *Virginia State Bar* (1975) 421 U.S. 773 [44 L.Ed.2d 572, 95 S.Ct. 2004], held that the state action exemption announced in *Parker* was inapplicable to a minimum fee schedule for lawyers published by a local bar association and enforced by the state bar. In order to come within *Parker,* anticompetitive activities must be compelled by direction of the state acting as a sovereign. (P. 791 [44 L.Ed.2d p. 587].) The Virginia Supreme Court was authorized to regulate the practice of law, and had

adopted ethical codes which dealt in part with fees, "and far from exercising state power to authorize binding price fixing, explicitly directed lawyers not 'to be controlled' by fee schedules." (P. 789 [44 L.Ed.2d p. 586].) When the state bar provided for disciplinary action for deviation from fee schedules, it "voluntarily joined in what is essentially a private anticompetitive activity" which is within the reach of the Sherman Act. (Pp. 791-792 [44 L.Ed.2d p. 587].)

In *Cantor v. Detroit Edison Co.* (1976) 428 U.S. 579 [49 L.Ed.2d 1141, 96 S.Ct. 3110], a private utility distributed, without additional charge, lightbulbs to residential customers, under a longstanding practice antedating state regulation of electric utilities. This practice, challenged as an unlawful "tie-in" of bulbs to electricity, was described in the utilities tariffs, which were binding on the utility until changed. Nevertheless, the challenged tie-in was held not to be immune from antitrust laws. The court pointed out that Chief Justice Stone in *Parker* had carefully selected language which plainly limited the court's holding to official action taken by state officials. (P. 591 [49 L.Ed.2d p. 1150].) "The cumulative effect of these carefully drafted references unequivocally differentiates between official action, on the one hand, and individual action (even when commanded by the State), on the other hand." (P. 591, fn. 24 [94 L.Ed.2d p. 1150].) The court emphasized that *Cantor* was distinguishable from *Parker* because the only defendant in *Cantor* was a public utility and there was no claim that any state action violated the antitrust laws. Since *Parker* involved the issue of whether the sovereign state itself was subject to the antitrust laws, it was not controlling in *Cantor*. (Pp. 591-592 [49 L.Ed.2d p. 1150].) Therefore, since the state had merely approved but had not mandated the "tie-in" arrangement, the state action "exemption" did not apply.

By contrast, a Sherman Act immunity was found in *Bates v. State Bar of Arizona* (1977) 433 U.S. 350 [53 L.Ed.2d 810, 97 S.Ct. 2691]. The United States Supreme Court found that a ban on price advertising, adopted by the Arizona Supreme Court, did not violate the Sherman Act, because the state court itself had adopted the challenged rule, and the state bar's role was completely defined. The court found the restraint to be compelled by direction of the state acting as sovereign. (P. 360 [53 L.Ed.2d p. 821].) Nevertheless, the ban on advertising was invalidated on the ground that it violated the First Amendment because of overbreadth. (Pp. 383-384 [53 L.Ed.2d pp. 835-836].)

Finally, in *Lafayette v. Louisiana Power & Light Co.* (1978) 435 U.S. 389 [55 L.Ed.2d 364, 98 S.Ct. 1123], the court held that cities were not

exempt from the federal antitrust laws, when they owned and operated electric utility systems both within and beyond their city limits. The court pointed out that cities have long been "persons" under the Sherman Act (citing *Chattanooga Foundry* v. *Atlanta* (1906) 203 U.S. 390 [51 L.Ed. 241, 27 S.Ct. 65].) The court concluded that the "*Parker* doctrine exempts only anticompetitive conduct engaged in as an act of government by the State as sovereign, or, by its subdivisions, pursuant to state policy to displace competition with regulation or monopoly public service." (P. 413 [55 L.Ed.2d p. 383].)

On the basis of their analysis of the above cases, plaintiffs conclude that, before local government can deprive the public of the benefits of competition, the conduct must be thoroughly analyzed, and the government must establish that it has been compelled by the state to engage in the otherwise unlawful activity.

Defendants subscribe to the concept that federal cases interpreting the Sherman Act are applicable to the Cartwright Act. (*Widdows* v. *Koch, supra,* 263 Cal.App.2d at p. 234.) However, they conclude that the federal cases can be used to support their position that San Francisco can regulate taxicab fares.

As previously stated, we have concluded that, under the limited circumstances of this case, the federal holdings are irrelevant. All parties ignore the problem of equating the system under which federal antitrust law is developed with the system under which California antitrust law is developed.

The Sherman Act cases are all based on the concept of state sovereignty. A city's antitrust liabilities and exemptions under the federal act are derived through an intermediate state sovereign located between the city and the federal government which enacted the law. Thus, in the framework of the federal act, San Francisco would have an antitrust exemption only if it was compelled to set taxicab fares by the State of California, the intermediate sovereign. It appears to us that the above described analysis is meaningless when attempting to determine a city's liability under the Cartwright Act. California is no longer an intermediate sovereign; it is the originator of the antitrust law. Cities are no longer acting through an intermediate sovereign as under the Sherman Act. In California, cities are operating under constraints imposed by the Cartwright Act, and their liabilities are determined solely by the California Legislature. In this instance, the state is acting as an originator of the antitrust laws, not as an intermediate sovereign under federal antitrust

concepts. To determine if San Francisco can set taxicab fares under the Cartwright Act, we need look only to California law. There is no intermediate sovereign between the cities and the originator of the antitrust laws.

■ To determine the nature and extent of San Francisco's responsibilities under the Cartwright Act, we should first determine whether, in enacting the Cartwright Act, the Legislature intended to allow cities to be sued as defendants. All parties argue the merits of *Widdows* v. *Koch, supra,* 263 Cal.App.2d 228, which held that cities were not "persons" under the act. While the reasoning of *Widdows* may be questionable, the basic holding is correct.[4] The Cartwright Act defines "persons" to include "corporations, firms, partnerships and associations." (Bus. & Prof. Code, § 16702.) It is apparent that this definition does not include cities.

On the other hand, we note that section 16750 of the Business and Professions Code, which is located in the Enforcement section of the Cartwright Act, does include a city within its definition of a person. Subdivision (a) of this section provides, in pertinent part, that "Any person who is injured in his business or property by reason of anything forbidden or declared unlawful by this chapter, may sue therefor . . . ." Subdivision (b) states that "The state and any of its political subdivisions and public agencies shall be deemed a person within the meaning of this section."

■ Fundamental rules of statutory interpretation require that a legislative act be read as a whole, and its various parts harmonized so as to give effect to legislative intent. Whenever possible, effect should be given to every word, phrase and clause so that no part or provision will be useless or meaningless. (*Smith* v. *Regents of University of California* (1976) 58 Cal.App.3d 397, 403 [130 Cal.Rptr. 118].)

■ It seems reasonable to assume that, in order to prevent its provisions from being useless, and to harmonize it with the earlier definition of "person," the Legislature included subdivision (b) of section 16750 because it had not intended to include the state and its political

---

[4]The internal reasoning of *Widdows* appears to us to be inconsistent. After determining that municipalities do not come within the definition of "persons," the court writes: "The city . . . made no contract or agreement and entered into no conspiracy in restraint of trade or to establish monopoly, but imposed the restraint as an act of government which the Cartwright Act did not undertake to prohibit." (P. 235.) Implicit in this language is the concept that a city is liable under the Cartwright Act if its actions are not characterized as an act of government. This is not consistent with its earlier holding that cities are not "persons" and are not subject to Cartwright Act restrictions.

subdivisions under the definition of "person" in section 16702. Subdivision (b) speaks in terms of "this section," i.e., section 16750. Thus it is clear that the state and its political subdivisions can sue *as plaintiffs* under the authority of this section. However, since they are "persons" *only* under that section, it is implicit that they cannot be sued as defendants. Therefore, if San Francisco is a political subdivision of the state, it cannot be sued under the Cartwright Act.

The City is a municipal corporation known by the name of San Francisco. (City & County of S.F. Charter (1978) art. I, § 1.100.)

■ Municipal corporations are political subdivisions of the state. Subject only to its own laws and Constitution, the state may create, expand, diminish or abolish such subdivisions, and all this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest. (*Weber* v. *City Council* (1973) 9 Cal.3d 950, 957 [109 Cal.Rptr. 553, 513 P.2d 601].)

■ It appears that, since San Francisco is a political subdivision of the state, the Legislature did not intend for it to be subject to the Cartwright Act. Accordingly, we conclude that the judgment on the pleadings in favor of defendants on the first cause of action must be affirmed.

Plaintiffs next argue that defendants have no authority to fix taxicab fares. This issue was raised in the eighth cause of action in the complaint in intervention.

Plaintiffs cite in part from article XII, section 23, of the California Constitution of 1879, as it read prior to the 1911 and 1914 amendments: "From and after the passage by the Legislature of laws conferring powers upon the Railroad Commission respecting public utilities, all powers respecting such public utilities vested in boards of supervisors, or municipal councils, or other governing bodies of the several counties, cities and counties, cities and towns, in this State, or in any commission created by law and existing at the time of the passage of such laws, shall cease so far as such powers shall conflict with·the powers so conferred upon the Railroad Commission; *provided, however, that this section shall not affect such powers of control over public utilities as relate to the making and enforcement of local, police, sanitary and other regulations, other than the fixing of rates . . . ."* (Italics added.)

Plaintiffs rely on the emphasized portion to support their position that cities cannot fix rates. They point out that, notwithstanding the repeal of this section in 1974, the portion thereof which relates to the setting of fares is still in effect.[5]

However, when the entire clause is read in context, plaintiffs' argument that the emphasized portion of section 23, article XII, *ante,* stands for the proposition that cities are not permitted to fix fares, must fail.

The relevant portion of article XII, section 23, provided, in pertinent part: "From and after the passage by the Legislature of laws conferring powers upon the Railroad Commission . . . all powers respecting such public utilities vested in boards of supervisors . . . of the several . . . cities and counties . . . shall cease so far as such powers shall conflict with the powers so conferred upon the Railroad Commission . . . ." (The Railroad Commission is the predecessor of the Public Utilities Commission.) This phrase indicates that, if there is a conflict between local laws and the powers granted to the commission by the Legislature, the commission powers override.

The next phrase qualifies the foregoing: "[P]rovided, however, that this section shall not affect such powers of control over public utilities as relate to the making and enforcement of local, police, sanitary and other regulations, other than the fixing of rates . . . ." This provision means that the Legislature cannot give the commission powers over local enforcement of local, police, sanitary or other regulations, with one exception, the setting of rates. Thus, if it so chooses, the Legislature can give the commission power to set rates. However, the clear implication is that if the Legislature fails to do so, the local government can fill the void with its own regulation.

This interpretation is supported by the present constitutional provision concerning regulation of public utilities. In 1974, the electors approved a new article XII which was entitled "Public Utilities" and discussed the powers of the Public Utilities Commission. Section 8 of article XII now provides that: "A city, county, or other public body may not regulate matters over which the Legislature grants regulatory power to the Commission. This section does not affect power over public utilities relating to the making and enforcement of police, sanitary, and other

---

[5]Plaintiffs rely on article XII, section 9, of the 1974 amendment, which reads: "The provisions of this article restate all related provisions of the Constitution in effect immediately prior to the effective date of this amendment and make no substantive change."

regulations concerning municipal affairs pursuant to a city charter existing on October 10, 1911, unless that power has been revoked by the city's electors, or the right of any city to grant franchises for public utilities or other businesses on terms, conditions, and in the manner prescribed by law." This section simply restates an existing rule that local government bodies may not regulate in areas in which the commission acts. Implicit in this provision is that, if the Legislature does not grant powers to the commission, then a city may regulate. Thus, to decide whether San Francisco has the power to regulate taxicab fares, it must first be determined if the Legislature has authorized the Public Utilities Commission to act in that area.

The California Constitution classifies taxicabs and their owners as public utilities. "Private corporations and persons that own, operate, control or manage a . . . system for the transportation of people or property . . . are public utilities subject to control by the Legislature." (Cal. Const., art. XII, § 3.) The Legislature has asserted this control in the Public Utilities Code.

Chapter 8 of the Public Utilities Code is entitled the "Passenger Charter-Party Carriers' Act." (Pub. Util. Code, § 5351 et seq.) A charter-party carrier of passengers is "every person engaged in the transportation of persons by motor vehicle for compensation, whether in common or contract carriage, over any public highway in this State." (Pub. Util. Code, § 5360.) There are exceptions to this definition, one of which is taxicabs. "The provisions of this chapter do not apply to: . . . Taxicab transportation service licensed and regulated by a city or county, by ordinance or resolution, rendered in vehicles designed for carrying not more than eight persons excluding the driver." (Pub. Util. Code, § 5353, subd. (g).)

Thus, it is clear that the Legislature has not given the Public Utilities Commission authority to regulate taxicab fares if they are already licensed and regulated by a city. The Legislature has thereby implicitly approved of local regulation of taxicabs; therefore, it follows that San Francisco is not precluded from regulating them.

Plaintiffs argue that, even if cities can regulate taxicabs, they are nowhere authorized to set fares. They contend that the words "licensed" and "regulated" in section 5353, subdivision (g), of the Public Utilities Code, are not synonymous with "setting fares." They claim that they can find no authority which permits a city to set fares.

In the case of *In re Martinez, supra,* 22 Cal.2d 259, the California Supreme Court held that the Railroad Commission (forerunner of the Public Utilities Commission) did not have jurisdiction over the regulation of taxicabs and that the City of Sacramento was acting within its power when it chose to fix fares for taxicab companies within the municipality.

Plaintiffs rely on *People* v. *Western Air Lines, Inc.* (1954) 42 Cal.2d 621 [268 P.2d 723], which overruled "Anything in the Martinez case which is out of harmony with these conclusions . . . ." (P. 642.)

*Western Air Lines, Inc.,* held that an airline was a public utility within the meaning of the California Constitution. (P. 639.) In reaching this conclusion, the Supreme Court expressed concern about the confusion which is alleged to have resulted from divergent holdings of the court on the question of whether a carrier, which is in fact a common carrier transportation company, should be subject to rate regulation by the commission although not specifically mentioned in the Constitution or the statute. (P. 639.)

The court first examined *Western Assn. etc. R. R.* v. *Railroad Comm.* (1916) 173 Cal. 802 [162 P. 391, 1 A.L.R. 1455], where it was held that the commission had jurisdiction over certain motor truck and transportation companies despite the fact that they were not specifically mentioned in the Constitution or statutes. (*People* v. *Western Air Lines, Inc., supra,* 42 Cal.2d at p. 640.) The court then contrasted that case with *In re Martinez, supra,* 22 Cal.2d 259, which had reasoned that since taxicabs were not specifically mentioned in the Constitution or statutes, they could *not* be regulated by the commission. (*Western Air Lines, Inc., supra,* 42 Cal.2d at p. 641.) In order to resolve an apparent inconsistency, the *Western Air Lines, Inc.* court overruled this reasoning in *Martinez.*

What remains of *Martinez* is the reasoning that the Legislature intended to exempt taxicabs from state regulation. This portion of the case finds independent support in an amicus curiae brief filed by the commission stating that the commission had consistently taken the position that its jurisdiction did not extend to the regulation of local taxicabs and for that reason it had never attempted to regulate their operation. (*People* v. *Western Air Lines, Inc., supra,* 42 Cal.2d at p. 641.) Thus, we conclude that the basic holding of *Martinez* that taxicab rates can be set by cities because the Legislature has not given this power to the commission is still good law. For this reason, plaintiffs' argument that there is no authority for the setting of taxicab fares by a city must fail.

Plaintiffs also argue that *In re Martinez, supra,* 22 Cal.2d 259, is inapposite because it established only the limited rights of local governments to regulate taxicab companies operating wholly within the city or county involved. Since taxis regulated by San Francisco are not wholly operated within the City, it is argued that *Martinez* does not apply. Plaintiffs contend that the growth of the taxicab business compels the conclusion that local jurisdictions no longer have the authority to regulate them; "If there is to be any regulation, it must be by the state."

■ We have no quarrel with the proposition that, as common carriers, taxicab rates may be subject to regulation by the state Legislature through the Public Utilities Commission. We observe, however, that the Legislature has not yet claimed jurisdiction, nor has it sought control in this area. Accordingly, we hold that, absent an assertion by the state of its authority to regulate taxicab rates, the city has the power to do so. Such holding is not "out of harmony" with *People* v. *Western Air Lines, Inc., supra,* 42 Cal.2d at page 642. Until the state does assume such jurisdiction, the fact that taxicabs occasionally (or even frequently) venture beyond the city and county limits is of no moment.

Plaintiffs' final argument is that even if the City is immune under the Cartwright Act, the individual members of the Board can be sued.

In *Martelli* v. *Pollock* (1958) 162 Cal.App.2d 655 [328 P.2d 795], the court found that members of the city council had immunity from liability toward persons affected by decisions made within the scope of their powers. The court reasoned that there was no question but that the council was empowered to pass ordinances and, despite allegations of wrongful motive, are protected by the doctrine of legislative immunity. (Pp. 658-659.) To support this, the court relied on *Hardy* v. *Vial* (1957) 48 Cal.2d 577 [311 P.2d 494]. In that case, the California Supreme Court stated, "The rule of absolute immunity, notwithstanding malice or other sinister motive, is not restricted to public officers who institute or take part in *criminal* actions. First recognized for the protection of judges [citation], it has been extended by the federal decisions to all executive public officers when performing within the scope of their power acts which require the exercise of discretion or judgment." (*Hardy, supra,* p. 582.) In addition, a city attorney and a clerk-administrator have immunity when acting within the scope of their employment. (*Martelli, supra,* at pp. 659-660.)

■ Here, the Board was operating within the scope of its powers. Its setting of taxicab rates did not violate the Cartwright Act. It strikes us as

both illogical and unreasonable to hold that the City cannot be sued under the Cartwright Act, and then permit the Board members to be individually liable for the same immune conduct.

The judgment on the pleadings in favor of defendants on the first cause of action of both complaints, and on the eighth cause of action of the complaint in intervention, is affirmed.

Taylor, P. J., and Kane, J., concurred.

A petition for a rehearing was denied June 8, 1979, and the petition of the plaintiffs and appellants and the intervener and appellant for a hearing by the Supreme Court was denied July 26, 1979. Bird, C. J., did not participate therein.