John M. DIMIDOWICH, dba Micro Image, Plaintiff-Appellant,

v.

BELL & HOWELL, Defendant-Appellee.

No. 84–1995.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 18, 1985.

Decided Nov. 6, 1986.

Robert F. Koehler, Jr., Sacramento, Cal., for plaintiff-appellant.

John R. Reese, McCutchen, Doyle, Brown, & Enersen, San Francisco, Cal., for defendant-appellee.

Before FLETCHER, BOOCHEVER, and NORRIS, Circuit Judges.

FLETCHER, Circuit Judge:

Dimidowich appeals the district court's summary judgment dismissing his antitrust action, in which he challenged Bell & Howell's ("B & H") policy of refusing to sell replacement parts for its microfilm equipment to independent companies that service B & H equipment. We affirm the dismissal of Dimidowich's claims alleging monopolization, attempted monopolization, unlawful tying, and unilateral refusal to deal. We reverse and remand the court's dismissal of Dimidowich's conspiracy claim.

## I. BACKGROUND

B & H is the nation's third largest manufacturer of microimagery (microfilm) products. B & H maintains an extensive service organization for the equipment it manufactures.

Until 1977, Dimidowich was employed by B & H as a service and sales representative. He left to establish his own business, Micro Image, which sells and services microfilm equipment, including B & H equipment, in the Sacramento, California area.

B & H maintains a policy of not selling replacement parts for its equipment except through its own service organization, or directly to owner-users. In other words, B & H does not sell parts for resale or for use by independent companies that service and repair B & H equipment. B & H's policy is unique in the industry.

B & H makes one exception to its policy. The company does not maintain its own service organization in the southwestern United States (Nevada, Arizona, New Mexico, and parts of Colorado and Texas). In that region, B & H sells replacement parts to a single authorized dealer-service representative, Comgraphix. B & H does not service microfilm equipment within this region, and Comgraphix does not service B & H equipment outside of this region.

In 1981, Dimidowich bid for and received contracts with several California state agencies to service and repair their microimagery equipment, including B & H equipment. B & H also submitted bids, but was unsuccessful in obtaining the contracts. After entering these contracts, Dimidowich sought to buy an inventory of replacement

parts from B & H. B & H refused to fill Dimidowich's orders.

In July 1982, Dimidowich tried to obtain the needed parts from Comgraphix. Comgraphix refused to sell them, on the ground that it was forbidden to do so under its distributorship agreement with B & H. Later, Comgraphix acknowledged that no such contractual prohibition existed, but still refused to sell to Dimidowich on the ground that Comgraphix did not wish to sell parts outside the geographic area in which it does business.

After B & H and Comgraphix refused to sell him the parts he needed, Dimidowich filed suit in state court, claiming that B & H's parts policy constituted an unlawful restraint of trade. B & H removed Dimidowich's state court action to the federal district court on the basis of diversity of citizenship. After several months of discovery, both parties moved for summary judgment. The district court granted B & H's motion and denied Dimidowich's. 590 F.Supp. 45. Dimidowich timely appealed.

## II. DISCUSSION

### A. Jurisdiction

Dimidowich named twenty fictitious or "Doe" defendants in the complaint he originally filed in California superior court. The presence of these Doe defendants causes us to examine our jurisdiction.

B & H removed this case to federal court on the basis of diversity of citizenship, 28 U.S.C. § 1441 (1982), and contended in its petition for removal that the Does were "mere sham defendants [who] are not identified with sufficient specificity to defeat diversity." The record does not show, however, that the district court ever dismissed the Does.

■ Although the presence of Doe defendants can destroy diversity and make removal improper in some circumstances, *see Hartwell Corp. v. Boeing Co.*, 678 F.2d 842 (9th Cir.1982), we need not face that issue here. This case falls within the rule of *Grubbs v. General Electric Credit*

*Corp.*, 405 U.S. 699, 92 S.Ct. 1344, 31 L.Ed.2d 612 (1972):

> [W]here after removal a case is tried on the merits without objection and the federal court enters judgment, the issue in subsequent proceedings on appeal is not whether the case was properly removed, but whether the federal district court would have had original jurisdiction of the case had it been filed in that court.

*Id.* at 702, 92 S.Ct. at 1347. The *Grubbs* rule has been applied when the merits are reached and determined on a motion for summary judgment. *Stone v. Stone*, 632 F.2d 740, 742 (9th Cir.1980), *cert. denied*, 453 U.S. 922, 101 S.Ct. 3158, 69 L.Ed.2d 1004 (1981).

This case, absent the Does, could have been brought originally under the district court's diversity jurisdiction, or the court could have dismissed the Does. B & H is a Delaware corporation with its principal place of business in Illinois; Dimidowich is a resident of California. The record does not show that Dimidowich ever attempted to amend his complaint to substitute anyone for the Does. Clearly, then, the Does are not indispensable parties, and the district court could have dismissed them. We do so now on appeal. *See Othman v. Globe Indemnity Co.*, 759 F.2d 1458, 1463 (9th Cir.1985).

### B. Applicable Law

In his complaint, Dimidowich challenged B & H's policy under a number of different antitrust theories. The complaint alleged that the policy constitutes an unlawful refusal to deal and a tying arrangement; that B & H and Comgraphix have conspired in restraint of trade; and that B & H has maintained or attempted to maintain a monopoly.

Dimidowich brought his claims under California's Cartwright Act. Cal.Bus. & Prof.Code §§ 16700–16760 (West 1964). The antitrust provisions of the Cartwright Act were patterned after section 1 of the Sherman Act, 15 U.S.C. § 1 (1982). *Corwin v. Los Angeles Newspaper Service Bureau*, 4 Cal.3d 842, 852, 484 P.2d 953, 94

Cal.Rptr. 785, 791 (1971). The California courts have held that federal cases interpreting the Sherman Act are persuasive authority under the Cartwright Act. *Chicago Title Insurance Co. v. Great Western Financial Corp.*, 69 Cal.2d 305, 315, 444 P.2d 481, 487, 70 Cal.Rptr. 849, 855 (1968).

After removal, the parties entered into a stipulation, providing that "California law governs this action, and California's Cartwright Act is construed in accordance with federal law under the Sherman Act." The parties relied almost exclusively on federal cases in their arguments to the district court and to us, the district court also relied exclusively on federal authority, and on appeal the parties continue to maintain that the Cartwright Act and the Sherman Act do not differ in any respect material to our disposition of this action. We disagree.

The California Supreme Court has said that the Cartwright Act "is similar in spirit and substance" to the Sherman Act. *Chicago Title Insurance Co.*, 69 Cal.2d at 322, 444 P.2d at 492, 70 Cal.Rptr. at 860. "Similar" does not mean identical. California courts have never said that federal authority is *binding* on them, even when there is California authority to the contrary, and California courts occasionally have rejected federal precedent in construing their act. *E.g., People v. City & County of San Francisco*, 92 Cal.App.3d 913, 917, 155 Cal. Rptr. 319, 321 (1979); *see Bruno v. Superior Court*, 127 Cal.App.3d 120, 131, 179 Cal.Rptr. 342, 348 (1981) ("[W]e respectfully exercise our prerogative to disagree with [federal precedents].").

California courts are free to interpret the Cartwright Act in accordance with the state policies embodied in that law. To the extent California courts would follow federal precedents, we, of course, must follow them too. But to the extent the California courts' interpretation of the Cartwright Act is different from federal interpretations of the Sherman Act, we must respect those differences, and follow the California courts' interpretation regardless of what the parties say the law might be.[1]

### C. Standard of Review, Applicability of Summary Judgment

We review de novo the district court's grant of summary judgment, viewing the evidence in a light most favorable to the losing party. *Compton v. Ide*, 732 F.2d 1429, 1434 (9th Cir.1984). We also review de novo the district court's interpretation of state law. *In re McLinn*, 739 F.2d 1395, 1403 (9th Cir.1984) (en banc).

Although summary judgment generally is disfavored in antitrust litigation, *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *Suburban Mobile Homes, Inc. v. Amfac Communities, Inc.*, 101 Cal. App.3d 532, 540, 161 Cal.Rptr. 811, 815 (1980), it appropriately may be granted if the nonmoving party does not show any issues of material fact and does not present an adequate record to support a finding in his favor. *Filco v. Amana Refrigeration, Inc.*, 709 F.2d 1257, 1260 (9th Cir.), *cert. denied*, 464 U.S. 956, 104 S.Ct. 385, 78 L.Ed.2d 331 (1983).

**1.** While it is generally true that parties may, in absence of strong contrary public policy, choose which forum's law will govern an action, *see, e.g., Lauritzen v. Larson*, 345 U.S. 571, 588–89, 73 S.Ct. 921, 931, 97 L.Ed. 1254 (1953); *Telco Leasing v. Transwestern Title Co.*, 630 F.2d 691, 693 (9th Cir.1980), they may not stipulate as to the content of that law. *See Twohy v. First Nat'l. Bank of chicago*, 758 F.2d 1185, 1190 (7th Cir.1985) (distinguishing between stipulation as to choice of law and as to meaning and scope of the law). It is well-settled that a court is not bound by stipulations of the parties as to questions of law. *Estate of Sanford v. Commissioner*, 308 U.S. 39, 51, 60 S.Ct. 51, 59, 84 L.Ed. 20 (1939); *Swift & Co. v. Hocking Valley Ry. Co.*,

243 U.S. 281, 289, 37 S.Ct. 287, 289, 61 L.Ed. 722 (1917); *Avila v. INS*, 731 F.2d 616, 620 (9th Cir.1984); *Fields v. Blue Shield of California*, 163 Cal.App.3d 570, 580 n. 5, 209 Cal.Rptr. 781, 786 n. 5 (1985); *Leonard v. City of Los Angeles*, 31 Cal.App.3d 473, 476, 107 Cal.Rptr. 378, 380 (1973). "While the parties may fix the facts by stipulation, they cannot thus change the law." *Los Angeles Shipbuilding & Drydock Corp. v. United States*, 289 F.2d 222, 231 (9th Cir.1961) (quoting *Crabb v. Commissioner*, 121 F.2d 1015, 1016 (5th Cir.1941)). In this case, the parties agreed that California law applied, and further that California law was substantively the same as federal law. We are not bound by the stipulation as to the substance of the law.

### D. *Dimidowich's Claims*

#### 1. *Tying*

Dimidowich's counsel made it clear at oral argument that he is no longer asserting a tying claim. Thus, we need not address this claim, and we affirm the district court's dismissal of it.

#### 2. *Monopolization and Attempted Monopolization*

No California statute deals expressly with monopolization or attempted monopolization. Combinations to monopolize would appear to fall within the general prohibitions of the Cartwright Act, Cal.Bus. & Prof.Code § 16720 (West 1964), *see Lowell v. Mother's Cake & Cookie Co.*, 79 Cal. App.3d 13, 23, 144 Cal.Rptr. 664, 671 (1978) (although not specifically listed, monopoly is a prohibited restraint of trade under Cartwright Act), but that statute does not address *unilateral* conduct, *see G.H.I.I. v. MTS, Inc.*, 147 Cal.App.3d 256, 266, 268, 195 Cal.Rptr. 211, 217, 218 (1983); *Bondi v. Jewels By Edwar, Ltd.*, 267 Cal.App.2d 672, 678, 73 Cal.Rptr. 494, 498 (1968).[2]

■ In his complaint, Dimidowich asserted a claim for conspiracy to monopolize between B & H and Comgraphix. Such a claim is cognizable under the Cartwright Act because it alleges the requisite combination of actors. But on appeal, Dimidowich's monopoly arguments challenge only unilateral conduct by B & H. This claim is not cognizable under the Cartwright Act, for it fails to allege any combination. Dimidowich's complaint did not allege a violation of the Sherman Act, section 2. 15 U.S.C. § 2 (1982). Since Dimidowich's monopoly arguments fail to state a cognizable claim under California law, and since California law is all he pleaded, we affirm the district court's dismissal of his monopolization and attempted monopolization claims.

#### 3. *Refusal to Deal*

■ A manufacturer may choose those with whom it wishes to deal and unilaterally may refuse to deal with a distributor or customer for business reasons without running afoul of the antitrust laws. *See Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984); *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919); *Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184, 1191 (9th Cir. 1984), *cert. denied*, 105 S.Ct. 1184 (1985); *Chicago Title Insurance Co.*, 69 Cal.2d at 324, 444 P.2d at 493, 70 Cal.Rptr. at 861; *G.H.I.I.*, 147 Cal.App.3d at 267–68, 195 Cal. Rptr. at 218. Nonetheless, there is a line of cases that supports the proposition that a manufacturer may form a "conspiracy" or "combination" under the antitrust laws if it imposes restraints on dealers or customers by coercive conduct and they involuntarily adhere to those restraints. *Albrecht v. Herald Co.*, 390 U.S. 145, 149–50, 88 S.Ct. 869, 871, 19 L.Ed.2d 998 (1968); *United States v. Parke, Davis & Co.*, 362 U.S. 29, 44–45, 80 S.Ct. 503, 511–12, 4 L.Ed.2d 505 (1960); *G.H.I.I.*, 147 Cal. App.3d at 268, 195 Cal.Rptr. at 218; *Kolling v. Dow Jones & Co.*, 137 Cal.App.3d 709, 720, 187 Cal.Rptr. 797, 805 (1982). Although the precedential value of this line of cases has been cast into some doubt by *Monsanto, see Monsanto*, 465 U.S. at 761, 764 n. 9, 104 S.Ct. at 1471 n. 9; 7 P. Areeda, Antitrust Law § 1451 (1986), we need not decide whether they survive *Monsanto* as a matter of either federal or California law or whether the combination, if proved, would be an unreasonable restraint of trade, since we conclude that, to the extent a "coercive" refusal to deal claim exists, Dimidowich has failed to make it.

■ Dimidowich has failed to show that he was coerced into adhering to B & H's policy or that he acquiesced in it, the two elements necessary to show a combination between himself and B & H.

---

2. Section 16720 of the Act, defines a trust as "a combination of capital, skill or acts *by two or more persons*" to carry out any of a number of prohibited purposes. Cal.Bus. & Prof.Code § 16720 (West 1964) (emphasis added).

B & H never threatened to stop selling parts to Dimidowich for his own equipment. Parts were always available subject to the condition that they not be used to repair or service third parties' equipment. B & H simply warned Dimidowich of its policy and enforced it against him. B & H never attempted to force Dimidowich to adhere to the policy or threatened any kind of retaliatory action if he failed to do so.

Nor did Dimidowich ever acquiesce in B & H's parts policy. On the contrary, he did everything he could to circumvent the policy. Dimidowich purchased some parts from B & H deceptively implying that they were for his own equipment, when, in fact, he used the parts to repair third parties' equipment. Dimidowich admits that he took parts from B & H equipment he owned and used them in servicing machines owned by others, and then ordered replacement parts for his own equipment from B & H.

The district court properly dismissed Dimidowich's refusal to deal claim.

### 4. Conspiracy

Dimidowich alleges that B & H and Comgraphix conspired to divide the market for service of B & H equipment and to refuse to deal with Dimidowich. Our threshold inquiry is whether there has been a showing of a combination or conspiracy. *Gianelli Distributing Co. v. Beck & Co.*, 172 Cal.App.3d 1020, 1043, 219 Cal.Rptr. 203, 214 (1985); *MacManus v. A.E. Realty Partners*, 146 Cal.App.3d 275, 287, 194 Cal. Rptr. 567, 573 (1983); *see Fisher v. City of Berkeley*, — U.S. —, 106 S.Ct. 1045, 1049, 89 L.Ed.2d 206 (1986). The district court concluded that Dimidowich failed to make a sufficient showing that B & H was engaged in concerted action with any other person. We disagree.

Since it is often difficult to show direct evidence of a combination or conspiracy, concerted action may be inferred from circumstantial evidence of the defendant's conduct and course of dealings. *Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665, 671 (9th Cir.1980). *See United States v. General Motors Corp.*, 384 U.S. 127, 142–43, 86 S.Ct. 1321, 1329, 16 L.Ed.2d 415 (1966). However, to survive a motion for summary judgment, Dimidowich "must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, — U.S. —, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986) (quoting *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471); *accord O.S.C. Corp. v. Apple Computer, Inc.*, 792 F.2d 1464, 1467 (9th Cir.1986).

Dimidowich's evidence showed that both B & H and Comgraphix refused to sell him the parts he sought and that they were aware of each other's refusals. Admittedly, these facts are perfectly consistent with independent action, but the evidence showed more. Although the agreement between B & H and Comgraphix does not prevent Comgraphix from selling or servicing B & H equipment outside its defined territory, as a matter of practice, neither B & H nor Comgraphix seeks service work in the other's territory. When Dimidowich attempted to buy parts from Comgraphix, a vice-president of that company originally told him that such a sale was forbidden by the distributorship agreement between B & H and Comgraphix. In a subsequent conversation, the Comgraphix officer said that he had been wrong—that the B & H-Comgraphix agreement did not forbid resale of parts. This time, the vice-president refused to sell the parts on the basis that Comgraphix would not sell to customers outside of its primary geographic territory.

B & H contends the initial reason given by Comgraphix was simply a mistake and does not give rise to an inference of concerted action. But the Comgraphix vice-president testified that when the B & H-Comgraphix dealership agreement was being negotiated consideration was given to including a provision that would have prevented Comgraphix from knowingly selling B & H parts for resale. At the very least, this shows that a proposal for a concerted refusal to deal had been made.

In addition, the last reason Comgraphix gave for not selling to Dimidowich, that it sold parts only to customers in its geographic territory, is not entirely convincing. Dimidowich showed that another service organization, Micro Data, which does do business in Comgraphix's territory, had also sought to purchase parts from Comgraphix and had been refused.

A jury reasonably could conclude that Comgraphix's stated reason for refusing to sell to Dimidowich was a mere pretext. Thus, Dimidowich has presented evidence that tends to support an inference of concerted action by B & H and Comgraphix and tends to exclude the possibility of independent action.

B & H contends that even if the evidence is sufficient to support an inference of concerted action, we should apply rule of reason analysis to this case, and, under that analysis, Dimidowich has failed to demonstrate unreasonable restraint of trade. Dimidowich counters that because the alleged conspiracy constitutes a group boycott, it is illegal per se.

■ Per se treatment, a conclusive presumption of unreasonableness, is reserved for practices that experience has demonstrated are almost always anticompetitive. *See Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 344, 349 n. 19, 102 S.Ct. 2466, 2473, 2475 n. 19, 73 L.Ed.2d 48 (1982); *Fisher v. City of Berkeley,* 37 Cal.3d 644, 670–71 nn. 20–21, 693 P.2d 261, 283 nn. 20–21, 209 Cal.Rptr. 682, 704 nn. 20–21 (1984), *aff'd on other grounds,* — U.S. —, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986). Concerted refusals to deal generally receive per se treatment where joint efforts by firms disadvantage competitors by inducing suppliers or customers to deny relationships the competitors need in order to compete. *Northwest Wholesale Stationers v. Pacific Stationary & Printing Co.,* 472 U.S. 284, 105 S.Ct. 2613, 2619, 86 L.Ed.2d 202 (1985). *See Marin County Board of Realtors v. Palsson,* 16 Cal.3d 920, 932, 549 P.2d 833, 840, 130 Cal.Rptr. 1, 8 (1976). Both Federal and

California courts are reluctant to pigeonhole all concerted refusals to deal as boycotts and rather have applied the rule of reason where the economic impact of the challenged practice is not obvious. *E.g., FTC v. Indiana Board of Dentists,* — U.S. —, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445 (1986); *Northwest Wholesale Stationers,* 105 S.Ct. at 2620–21; *Marin County,* 16 Cal.3d at 934, 549 P.2d at 841, 130 Cal.Rptr. at 9.

■ We determine the economic impact of the alleged conspiracy largely by examining the economic relationship between the parties. If the relationship between B & H and Comgraphix could be categorized as purely "horizontal" (between competitors at the same level of distribution), the alleged agreement would fit squarely within the per se pattern. *See Northwest Wholesale Stationers,* 105 S.Ct. at 2619. On the other hand, if the relationship is purely "vertical" (between entities at different levels of the same distribution chain), we would apply the rule of reason. *See Continental TV v. GTE Sylvania,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *Gianelli,* 172 Cal.App.3d at 1045, 219 Cal.Rptr. at 216 (quoting *Cascade Cabinet Co. v. Western Cabinet & Millwork,* 710 F.2d 1366, 1371 (9th Cir.1983)); *Kolling,* 137 Cal.App.3d at 726, 187 Cal.Rptr. at 809. B & H's relationship with Comgraphix is quite complex. In the market for purchase of B & H micrographic equipment ("product market"), B & H distributes its own products to much of the country, but uses Comgraphix as a distributor in the Southwest. Such arrangements, in which a manufacturer operates at two distinct levels of the distribution chain in the same market by acting as both a supplier and a distributor of its own products, are referred to as dual distributorships. *See, e.g., Krehl v. Baskin Robbins Ice Cream Co.,* 664 F.2d 1348, 1350–51 (9th Cir.1982). In addition, B & H and Comgraphix both repair B & H equipment, so are competitors in the "service market."[3] Thus, the

---

3.  B & H claims that service cannot be treated as

being separable from a product market and

alleged conspirators are in a "hybrid" arrangement composed of both a dual distributorship and a horizontal relationship.

If the Sherman Act governed this case, we would have no trouble determining that the rule of reason applies. We have categorized restrictions imposed in the context of dual distributorships as vertical and analyzed them under the rule of reason. *Krehl,* 664 F.2d at 1355–57. Other recent federal cases have also applied the rule of reason to such restrictions. *See, e.g., Davis-Watkins Co. v. Service Merchandise,* 686 F.2d 1190, 1201–02 (6th Cir.1982), *cert. denied,* 466 U.S. 931, 104 S.Ct. 1718, 80 L.Ed.2d 190 (1984); *Copy-Data Systems, Inc. v. Toshiba America, Inc.,* 663 F.2d 405, 409–11 (2d Cir.1981); *Abadir & Co. v. First Mississippi Corp.,* 651 F.2d 422, 426–29 (5th Cir.1981); *but see* cases cited in *Copy-Data Systems,* 663 F.2d at 409. The parties have cited few cases involving dual distributorships, and none involving a hybrid arrangement.[4] *See Krehl,* 664 F.2d at

1355 (noting paucity of dual distributor cases). We do not have enough experience with this type of arrangement to say with any confidence that a concerted refusal to deal in this context almost always will be anticompetitive.[5] *See Northwest Wholesale Stationers,* 105 S.Ct. at 2621 (rejecting per se approach where no showing that challenged activity likely to have predominantly anticompetitive effects). Moreover, one justification for rule of reason analysis of restrictions in the context of a dual distributorship is that they provide corresponding benefits in the interbrand market. *See Krehl,* 664 F.2d at 1356–57. Because of the vertical element of the alleged "hybrid" agreement, the restriction in the service market may well result in the same type of significant procompetitive effects in the product market as do restrictions in the context of a dual distributorship. Accordingly, we conclude that, under the Sherman Act, rule of reason analysis would be appropriate for the "hybrid" conspiracy.[6]

therefore that the alleged arrangement is merely a dual distributorship. We disagree. It is evident that for certain products (automobiles are the most obvious example), the product market is not co-extensive with the service market. The fact that Dimidowich, who is not a distributor, services other brands of micrographic equipment suggests that the markets are separate in the micrographic industry. B & H is entitled, however, to try to prove at trial that the markets are unified.

B & H also claims, somewhat inconsistently, that the service market encompasses all brands of micrographic equipment and therefore that the alleged restraint does not hinder competition significantly in that market. Dimidowich's own varied business supports this claim to some extent. However, an owner of broken B & H micrographic equipment is indifferent to people who can service Kodak or 3M machines. If the owner's only option is to request service from B & H or Comgraphix (depending on his location), that is obviously the market the owner faces. B & H is entitled to prove that replacement parts for different brands of micrographic equipment are interchangeable and therefore that its policy has no anticompetitive effect. However, if that is the case, its replacement parts policy makes little sense. In any event, B & H is not entitled to summary judgment on the ground that there is no evidence of anticompetitive effect.

4. The two cases primarily relied upon by B & H, *Calculators Hawaii, Inc. v. Brandt, Inc.,* 724 F.2d 1332 (9th Cir.1983) and *Bushie v. Stenocord*

*Corp.,* 460 F.2d 116 (9th Cir.1972), both involve restraints in the context of purely vertical arrangements: distributors complained that outlets of the manufacturer displaced them. Although in both cases, plaintiffs both sold and serviced the manufacturer's product, there was no evidence in either case that the manufacturer was dividing up the service market with one of its distributors, or refusing to sell parts pursuant to such a market division.

5. The parties point to no cases analyzing dual distributorships under the rule of reason that have found restraints that were, on balance, anticompetitive. This absence of demonstrated anticompetitive effect supports our conclusion that a per se rule is inappropriate.

6. We note that a "hybrid" arrangement only justifies the application of the rule of reason where the market in which the conspirators are in a vertical relationship is in some way interdependent with the market in which they have a horizontal relationship. The fact that Conglomerate A supplies Conglomerate B with bread to sell in B's retail stores almost certainly has nothing to do with A and B's ability to agree to sell steel at the same price. The latter is still horizontal price-fixing and illegal per se. Only when there is a possibility that the restraint in the market in which there is a horizontal relationship will have significant procompetitive effects in the other market, as is the case when the markets are for the service and the distribu-

However, we are interpreting the Cartwright Act, not the Sherman Act, and must decide what the California courts would do. Appellant contends that our decision should be controlled by a California appellate case that applies per se analysis to a dual distributorship arrangement, *Guild Wineries & Distilleries v. J. Sosnick & Son*, 102 Cal.App.3d 627, 162 Cal.Rptr. 87 (1980). We agree that this court is bound to follow a state court's interpretation of that state's statutes. We disagree, however, that *Guild Wineries* represents the authoritative interpretation of California's Cartwright Act on this issue.

■■■■■ This court will follow a state supreme court's interpretation of its own statute in the absence of extraordinary circumstances. *Knapp v. Cardwell*, 667 F.2d 1253, 1260 (9th Cir.), *cert. denied*, 459 U.S. 1055, 103 S.Ct. 473, 74 L.Ed.2d 621 (1982); *see Hillery v. Rushen*, 720 F.2d 1132, 1138 n. 5 (9th Cir.1983); *see also Reding v. Texaco, Inc.*, 598 F.2d 513, 519 (9th Cir. 1979) (application of state constitution to state statute). The California Supreme Court has not determined how it will treat restraints imposed in the context of a hybrid arrangement or imposed by dual distributors. Where the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it. *Fiorito Brothers, Inc. v. Fruehauf Corp.*, 747 F.2d 1309, 1314 (9th Cir.1984); *Associated General Contractors v. San Francisco Unified School District*, 616 F.2d 1381, 1384 (9th Cir.), *cert. denied*, 449 U.S. 1061, 101 S.Ct. 783, 66 L.Ed.2d 603 (1980); *Scandinavian Airlines System v. United Aircraft Corp.*, 601 F.2d 425, 427 (9th Cir. 1979). In answering that question, this court looks for "guidance" to decisions by intermediate appellate courts of the state and by courts in other jurisdictions. *Lewis v. Anderson*, 615 F.2d 778, 781 (9th Cir. 1979), *cert. denied*, 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980); *see also Estrella v. Brandt*, 682 F.2d 814, 817 (9th Cir.1982) (federal court must consider "all available

data"); *Takahashi v. Loomis Armored Car Service*, 625 F.2d 314, 316 (9th Cir. 1980) (federal court may look to "well-reasoned decisions from other jurisdictions"); *Scandinavian Airlines*, 601 F.2d at 427 ("California Courts of Appeal decisions are data"); *American Sheet Metal v. Em-Kay Engineering Co.*, 478 F.Supp. 809, 813 (E.D.Cal.1979) ("decisions by California Courts of Appeal are merely data"). Decisions by state intermediate appellate courts are data which are "not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Estrella*, 682 F.2d at 817 (quoting *West v. AT & T Co.*, 311 U.S. 223, 236–37, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940)); *accord Fleury v. Harper & Row, Publishers*, 698 F.2d 1022, 1026 (9th Cir.) ("in the absence of convincing evidence"), *cert. denied*, 464 U.S. 846, 104 S.Ct. 149, 78 L.Ed.2d 139 (1983). In this case, convincing evidence exists which compels this court to disregard the *Guild Wineries* case.

■■■■ The court in *Guild Wineries* decided that a distributor's termination in the context of a dual distributorship arrangement should be judged by per se principles. 102 Cal.App.3d at 633, 162 Cal.Rptr. at 91. It concluded that when a manufacturer "became a distributor," its relationship with its fellow distributors was horizontal, and it lost the right to dictate territorial divisions to a "fellow distributor." *Id.* We suggest the analysis in *Guild Wineries* is flawed. Although a manufacturer's relationship with its distributors has an horizontal aspect when it acts as a distributor itself, it remains primarily a vertical relationship. A manufacturer retains some right to place restraints on its distributors to improve its ability to compete in the product market.

The approach of the *Guild Wineries* court appears to mischaracterize the dual distributorship arrangement and also to disregard the fact that the California Supreme Court does not apply a per se ap-

tion of the same product, is rule of reason analysis appropriate.

proach to arrangements with which it is unfamiliar. *See Fisher,* 37 Cal.3d at 668, 670–71 nn. 20–21, 693 P.2d at 281, 283 nn. 20–21, 209 Cal.Rptr. at 702, 704 nn. 20–21 (declining to apply per se rule to new arrangement without benefit of evidence of economic consequences); *see also Maricopa County Medical Society,* 457 U.S. at 349 n. 19, 102 S.Ct. at 2475 n. 19 (new per se rule not employed before considerable judicial experience with challenged restraint); *Broadcast Music, Inc. v. CBS,* 441 U.S. 1, 19 n. 22, 99 S.Ct. 1551, 1559 n. 22, 60 L.Ed.2d 1 (1979) (same). *Guild Wineries* also ignores the possible benefits to interbrand competition that can result from allowing restrictions in the intrabrand market. *See Gianelli,* 172 Cal.App.3d at 1045 n. 7, 219 Cal.Rptr. at 215 n. 7. We are convinced the California Supreme Court would follow our decision in *Krehl* and would analyze both restrictions in the context of dual distributorships and the alleged hybrid conspiracy at issue under the rule of reason. *Cf. Gianelli,* 172 Cal. App.3d at 1047, 219 Cal.Rptr. at 217 (where benefit appears to redound to benefit of manufacturer in product market, rule of reason applied).

▮▮▮ Though we agree with B & H as to the type of analysis that is appropriate, we disagree with its contention that Dimidowich has not presented sufficient evidence of an unreasonable restraint of trade to survive summary judgment. In order to show a violation of the Cartwright Act in a rule of reason case, a plaintiff must show that either the purpose of the effect of the conspiracy is an illegal restraint of trade. *Corwin v. Los Angeles Newspaper Service Bureau,* 22 Cal.3d 302, 314, 583 P.2d 777, 784, 148 Cal.Rptr. 918, 925 (1978); *see Kolling,* 137 Cal.App.3d at 726–27, 187 Cal. Rptr. at 809. Dimidowich has presented evidence that raises factual issues as to both the purpose and the effect of the restraint.

▮▮ B & H has offered several reasons for its refusal to sell parts to Dimidovich, some of which involve improving its competitive standing in the market for micrographic equipment. In particular, it claims that refusing to deal with Dimidowich was necessary for it to operate its own service organization. The service organization enables it to maintain quality of service, pass on technical advances, and propose sales of its supplies, parts and replacement equipment to its customers through its service personnel.[7] Dimidowich's evidence suggests that these reasons might be pretextual.

From June 1979 to April 1982, Dimidowich placed four parts orders with B & H, and all were filled. Apparently, some of these orders were for use in third parties' machines. B & H contends it did not know this, but Dimidowich has presented evidence that it did. In August 1982, Dimidowich received a contract to service equipment, including B & H equipment, for the California State Teachers Retirement System. B & H also bid on the contract, but lost. When Dimidowich sought to procure an inventory of replacement parts from B & H, the order was rejected.

Dimidowich also presented evidence that another independent sales and service operation, Micro Data, had a similar experience. B & H attempted to enforce its parts policy after Micro Data obtained significant service contracts, although B & H later backed down under pressure from Micro Data. A finder of fact could conclude from this evidence that B & H never attempted to enforce its policy until it became concerned about competition in the service market.

Moreover, the evidence regarding Comgraphix's conflicting explanations to Dimidowich about its refusal to sell parts are more suggestive of a conspirator's attempt to disguise an horizontal agreement to eliminate competition than of a distribu-

---

**7.** B & H also alleges that it refused to deal because it would cost more to maintain a parts inventory sufficient to supply independent service organizations and because random parts orders could deplete inventories necessary for its own service operations. These reasons, however, do not explain why B & H would conspire with Comgraphix to refuse to deal.

tor's assertion that a manufacturer compelled it to act. It may be true that B & H decided to force its distributor to adhere to B & H's policy of not selling replacement parts and that it did so with the permissible purpose of improving its ability to compete in the product market. However, it has not formalized the policy by contract or writing nor have B & H and Comgraphix admitted that they agreed to the restraint. If a jury believed that there was an agreement, it would be entitled to infer from the behavior of the conspirators that the agreement was designed solely to discourage or eliminate significant competitors in the service market, rather than to compete more effectively in the product market.

Dimidowich's evidence also raises a jury question as to the effect of the alleged conspiracy. First of all, a jury could conclude from the evidence relating to purpose that B & H did not consider the restraint important to the micrographic equipment market and therefore that the procompetitive effect of the restraint on that market is trivial. *See Broadcast Music*, 441 U.S. at 19, 99 S.Ct. at 1558 (purpose tends to show effect). More importantly, the alleged agreement clearly has an anticompetitive effect on the market for service of B & H equipment. In absence of a vertical component, an agreement between two competitors that deprives a third competitor of access to a necessary element of doing business is per se illegal.[8] *See Northwest Wholesale Stationers*, 105 S.Ct. at 2519. The question in a rule of reason case is whether the anticompetitive effects of the restraint outweigh the procompetitive effects. *Gianelli*, 172 Cal.App.3d at 1048; 219 Cal.Rptr. at 218 (quoting *CBS v. American Society of Composers*, 620 F.2d 930, 934 (2d Cir.1980), *cert. denied*, 450 U.S. 970, 101 S.Ct. 1491, 67 L.Ed.2d 621 (1981)); *see Maricopa County Medical Society*, 457 U.S. at 343, 102 S.Ct. at 2472; *Continental TV*, 433 U.S. at 49, 57 n. 27,

97 S.Ct. at 2557, 2561 n. 27. In this case, that question may be expressed as whether the anticompetitive effects in the service market outweigh the procompetitive effects, if any, in the micrographic equipment market.

The defendant's assertion of legitimate business justifications for its behavior, in the absence of substantial evidence tending to rebut the resulting inference of lawful conduct, will generally result in summary judgment. *See O.S.C. Corp.*, 792 F.2d at 1469 (citing cases); *see also Matsushita*, 106 S.Ct. at 1357 (antitrust law limits range of permissible inferences from ambiguous evidence in a Sherman Act Section 1 case). However, when this type of hybrid arrangement is at issue, we think the balancing of the anticompetitive effects against the asserted justifications must be left to the jury. If, as seems likely from B & H's 10–15% market share, the micrographic equipment market is significantly larger than the service market for B & H equipment, then a non-trivial procompetitive effect in the product market will outweigh the anticompetitive effect in the service market. However, as we have noted, the jury could infer from Dimidowich's evidence that the procompetitive effect was trivial. In addition, the service market may be larger than is apparent from the limited record before us. Dimidowich's conspiracy claim should have survived the summary judgment motion.

### III. CONCLUSION

We affirm the district court's grant of summary judgment, except as to Dimidowich's conspiracy claim. We remand that claim for trial.

AFFIRMED in part, and REVERSED and REMANDED in part.

---

**8.** We note that the harm alleged is to competition, not merely to a competitor. *Cf. Calculators Hawaii v. Brandt, Inc.*, 724 F.2d 1332, 1337–38 (9th Cir.1983). The California state agencies that selected Dimidowich's bid to service their B

& H equipment over B & H's bid are not receiving the same service (with full access to replacement parts) that they would receive if the service market were fully competitive.