[No. D003990. Fourth Dist., Div. One. Jan. 6, 1987.]

STANLEY PENN et al., Plaintiffs and Appellants, v.
CITY OF SAN DIEGO et al., Defendants and Respondents.

**COUNSEL**

Louis S. Katz for Plaintiffs and Appellants.

John W. Witt, City Attorney, Ronald L. Johnson, Senior Chief Deputy City Attorney, Eugene P. Gordon, Chief Deputy City Attorney, and Leslie J. Girard, Deputy City Attorney, for Defendants and Respondents.

OPINION

LEWIS, J.—Stanley Penn, sole owner of the Lucky Lady Card Room in the City of San Diego (City), appeals a summary judgment entered in favor of the City and William B. Kolender, City's police chief, that Penn and the cardroom take nothing on their complaint for declaratory and injunctive relief seeking to declare invalid as an unconstitutional exercise of the police power and a violation of antitrust law City Municipal Code section 33.3917 which fixes a maximum hourly rate of $2.50 per hour for players in the cardroom.[1] Holding the section represents a reasonable exercise of the police power and is not subject to antitrust law, we affirm.

The Lucky Lady Card Room at 5526 El Cajon Boulevard is the largest cardroom[2] in the City, operating 7 card tables 14 hours per day, 6 days per week from 10 a.m. to midnight, 52 weeks per year. It has gross annual revenues of between $450,000 and $500,000 and employs 42 people. It pays a table tax totalling $1,030 per month, up 736 percent from the $140 table tax it paid in 1974. In 1984 it also paid a license tax of $25 per table and $2 per employee, totalling $265, and a $500 registration fee under the Gaming Registration Act. (Bus. & Prof. Code, §§ 19800-19826.)

Between 1946 and 1976 the maximum charge per player per hour rose from 60 cents to $2. In 1976 the rate was changed to the present $2.50 figure. Before the 1976 increase the City manager concurred in a recommendation of $4 per player per hour. In 1979 the City manager recommended that $5 be charged and that consideration be given to eliminating altogether the limit on what cardrooms can charge players. While a City council committee voted to deregulate the charge, the full City council took no action on the proposal. A similar deregulation proposal in 1980 was not acted on.

In the record there are several reports prepared by the City concerning the regulation of cardrooms. Among the reports there is a September 1982 report of the City manager discussing results of surveys of law enforcement agencies. This report states in part: "It is the opinion of the San Diego Police Department that card rooms create an environment conducive to crime. However, there are few statistical crime reports available regarding the various crimes believed to be associated with cardrooms. (A significant

---

[1] City Municipal Code section 33.3917 reads: "No charge in excess of Two Dollars and Fifty Cents ($2.50) per hour shall be collected from any player for the privilege of participating in any game."

[2] Under City Municipal Code section 33.3911, subdivision (b), the only games permitted to be played in a cardroom are high and low draw poker without variation as defined by Hoyle's Modern Encyclopedia of Card Games by Walter B. Bigson, and contract bridge or auction bridge. Included in the regulatory scheme are limits of no more than seven card tables and eight players per table in any cardroom. (City Mun. Code, § 33.3911, subds. (c) and (d).)

exception is the crime of bookmaking. Police records indicate that in the last year, ten major bookmaking investigations conducted by the Police Department centered around licensed cardrooms. The investigations resulted in fourteen felony arrests and eleven felony convictions.) Crime detection and law enforcement of card room activity is not easily accomplished. In general, information on criminal activity relating to cardrooms is seldom reported to the police. Moreover, because law enforcement officers are recognized by owners/operators and patrons of card rooms, it is difficult to directly detect illegal activities. As a result, most of the criminal information developed by the Police Department is gathered either from informants or through lengthy and costly undercover surveillance operations."

In 1983 the City revised its cardroom ordinance, maintaining the $2.50 per player per hour charge and providing for a phase out of cardroom businesses. The phase out is accomplished by setting the maximum number of cardrooms as the number of cardrooms then licensed, to be reduced by the number of any cardroom licenses surrendered, revoked or not renewed, and by restricting transfer of licenses including provisions for license termination on the death of an individual licensee and a maximum 10-year life to transfers permitted during the first 2 years after the effective date of the ordinance. (City Mun. Code, §§ 33.3908, 33.3909, 33.3910.) In 1984 the City manager recommended against deregulation of the maximum hourly charge per player on the basis such a recommendation would be inconsistent with the City council's goals to curtail the growth of cardrooms and eventually decrease their number.

City's 1983 cardroom ordinance begins with the following statement of findings by the City council: "The City Council finds that existence of cardrooms within the City of San Diego has necessitated ever-increasing efforts by Police Department personnel in investigating and responding to criminal activity occurring in and around such establishments; that these increased efforts bring additional costs to the taxpayers and residents of the City, that such establishments attract the incursion of criminal elements into the City, may encourage compulsive gambling, and aggravate existing crime problems in areas of the City where such establishments exist. In order to eliminate the deleterious effects that such establishments have on the safety, welfare, and morals of the City, the City Council finds that it is necessary to enact the following regulations and provisions governing the establishment, operation, management and continued existence of cardrooms within the City." (City Mun. Code, § 33.3901.)

I

Penn contends the maximum $2.50 hourly charge per player is an unconstitutional exercise of the police power because it does not have a

reasonable relationship to any of the objectives set forth in ordinance's statement of findings. He characterizes those objectives as raising more money to offset the costs of police activity, deterring the attraction of characters inclined to criminal activity and discouraging compulsive gambling. He states no criticism of these as proper objectives to be sought in the exercise of the police power.

■ The settled general rule is "that legislation regulating prices or otherwise restricting contractual or property rights is within the police power if its operative provisions are reasonably related to the accomplishment of a legitimate governmental purpose [citations] and that the existence of an emergency is not a prerequisite to such legislation [citations]." (*Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129, 158 [130 Cal.Rptr. 465, 550 P.2d 1001], fn. omitted.) "In determining the validity of a legislative measure under the police power our sole concern is with whether the measure reasonably relates to a legitimate governmental purpose and '[w]e must not confuse reasonableness in this context with wisdom.' (*Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control, supra,* 65 Cal.2d 349, 359 [55 Cal.Rptr. 23, 420 P.2d 735]; accord, *Consolidated Rock Products Co.* v. *City of Los Angeles, supra,* 57 Cal.2d 515, 522 [20 Cal.Rptr. 638, 370 P.2d 342].)" (*Birkenfeld, supra,* at p. 159.)

*Consolidated Rock Products Co.* v. *City of Los Angeles* (1962) 57 Cal.2d 515, 522 [20 Cal.Rptr. 638, 370 P.2d 342], more expansively describes the court's role as follows: "[T]he determination of the necessity and form of such regulations, as is true with all exercises of the police power, is primarily a legislative and not a judicial function, and is to be tested in the courts not by what the judges individually or collectively may think of the wisdom or necessity of a particular regulation, but solely by the answer to the question is there any reasonable basis in fact to support the legislative determination of the regulation's wisdom and necessity? Thus in *Miller, supra,* this court said in 195 Cal. at page 490 [234 P. 381, 38 A.L.R. 1479]: 'The courts may differ with the [L]egislature as to the wisdom and propriety of a particular enactment as a means of accomplishing a particular end, but as long as there are considerations of public health, safety, morals, or general welfare which the legislative body may have had in mind, which have justified the regulation, it must be assumed by the court that the legislative body had those considerations in mind and that those considerations did justify the regulation. . . . [W]hen the necessity or propriety of an enactment [is] a question upon which reasonable minds might differ, the propriety and necessity of such enactment [is] a matter of legislative determination.' "

In short, we find the requisite reasonable relationship to a legitimate governmental purpose "in the absence of an unquestionable contrary

showing." (*Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control* (1966) 65 Cal.2d 349, 359 [55 Cal.Rptr. 23, 420 P.2d 735].)

■ Applying these principles, it is readily apparent that maintaining a low maximum hourly charge to players in cardrooms is reasonably related to a legitimate governmental purpose of discouraging gambling centers. The phase out scheme of the cardroom ordinance reveals such discouragement is a purpose of the ordinance and there is no question this is a legitimate governmental purpose. While as Penn points out such a low maximum provision may not discourage the individual player, it certainly could be considered by the legislative body as appropriate to discourage the maintenance of the gambling establishment. The City council properly could conclude that impacting the provider of the business sought to be discouraged is as reasonable as impacting the consumer of that business. The reasonableness of the stated relationship strengthens when one considers the increases in the cost of doing business represented by such items as the table tax increases of 736 percent during the comparable period of time.

■ In this connection, Penn's assertion the $2.50 maximum hourly charge established by City Municipal Code section 33.3917 is confiscatory is simply not established by the record. The Lucky Lady Card Room has yearly gross revenues on the order of a half million dollars, and while net figures are not in the record, Penn acknowledges in his opening brief that for over nine years he has been "in the business of *successfully* operating cardrooms." (Italics added.) On the record here, it cannot be said that Penn has been deprived of substantially all reasonable use of his property. (See *Griffen Development Co.* v. *City of Oxnard* (1985) 39 Cal.3d 256, 266-267 [217 Cal.Rptr. 1, 703 P.2d 339].)

Penn makes no unquestionable showing of an absence of a reasonable relationship between City Municipal Code section 33.3917 and a legitimate government purpose. In fact, as we have seen, the contrary is true. Accordingly, we hold the section is constitutional as a valid exercise of the police power.

## II

■ Penn contends City Municipal Code section 33.3917 unlawfully restrains trade under the Cartwright Act. (Bus. & Prof. Code, § 16700 et seq.)[3] To make this argument Penn urges this court to disregard *People* ex

[3]In light of the recent United States Supreme Court decision, *Fisher* v. *City of Berkeley, Cal.* (1986) 475 U.S. 260 [89 L.Ed.2d 206, 106 S.Ct. 1045], holding there is no element of concerted action in a rent control ordinance, Penn has abandoned his argument made in the trial court that the $2.50 maximum price set by City Municipal Code section 33.3917 constituted a restraint of trade preempted by the Sherman Antitrust Act. (15 U.S.C. § 1.)

rel. *Freitas* v. *City and County of San Francisco* (1979) 92 Cal.App.3d 913 [155 Cal.Rptr. 319], holding that cities are not "persons" who can be sued under the Cartwright Act. (Bus. & Prof. Code, § 16702.)[4] Penn's theory is that the reasoning of *Freitas* has been undermined by a recent Supreme Court case concluding that the professions, there the medical profession, though also not expressly mentioned as "persons" in the Cartwright Act, are subject to suit under the Cartwright Act. (*Cianci* v. *Superior Court* (1985) 40 Cal.3d 903, 925 [221 Cal.Rptr. 575, 710 P.2d 375], overruling *Willis* v. *Santa Ana etc. Hospital Assn.* (1962) 58 Cal.2d 806 [26 Cal.Rptr. 640, 376 P.2d 568].) We cannot accept Penn's argument.

Neither Supreme Court case used reasoning as was used in *Freitas*. *Freitas* was required to harmonize the language of Business and Professions Code section 16702 defining "persons" subject to the Cartwright Act and not mentioning political subdivisions with Business and Professions Code section 16750, subdivisions (a) and (b), defining "persons" entitled to sue under the Cartwright Act and expressly mentioning political subdivisions as "persons" for purposes of bringing such a suit.[5]

*Freitas* thus reasoned: "It seems reasonable to assume that, in order to prevent its provisions from being useless, and to harmonize it with the earlier definition of 'person,' the Legislature included subdivision (b) of section 16750 because it had not intended to include the state and its political subdivisions under the definition of 'person' in section 16702. Subdivision (b) speaks in terms of 'this section,' i.e., section 16750. Thus it is clear that the state and its political subdivisions can sue *as plaintiffs* under the authority of this section. However, since they are 'persons' *only* under that section, it is implicit that they cannot be sued as defendants. Therefore, if San Francisco is a political subdivision of the state, it cannot be sued under the Cart-

---

[4]The Cartwright Act, in Business and Professions Code section 16702, defines "persons" to include "corporations, firms, partnerships and associations existing under or authorized by the laws of this State or any other State, or any foreign country."

[5]Business and Professions Code section 16750, subdivisions (a) and (b), provide: "(a) Any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, may sue therefor in any court having jurisdiction in the county where the defendant resides or is found, or any agent resides or is found, or where service may be obtained, without respect to the amount in controversy, and to recover three times the damages sustained by him or her, interest on his or actual damages pursuant to Section 16761, and shall be awarded a reasonable attorneys' fee together with the costs of the suit.

"Such action may be brought by any person who is injured in his business or property by reason of anything forbidden or declared unlawful by this chapter, regardless of whether such injured person dealt directly or indirectly with the defendant.

"The amendments to this section adopted at the 1959 Regular Session of the Legislature do not apply to any action commenced prior to September 18, 1959.

"(b) *The state and any of its political subdivisions and public agencies shall be deemed a person within the meaning of this section.*" (Italics added.)

wright Act." (*Freitas, supra,* 92 Cal.App.3d at pp. 920-921.) *Freitas* concluded a city is a political subdivision which cannot be sued under the Cartwright Act. (92 Cal.App.3d at pp. 920-921.)

*Cianci* did not deal with language in the Cartwright Act showing legislative intent not to include the professions within the section 16702 definition of persons subject to suit. Accordingly, the *Cianci* reasoning does not undermine the different, statutorily grounded reasoning of *Freitas.* The same is true of *Willis,* which *Cianci* overruled on the question of the medical profession's susceptibility to suit under the Cartwright Act.[6] We observe that on August 1, 1985, just five months before the December 31, 1985, decision in *Cianci,* the Supreme Court relied on *Freitas* to state the proposition "[t]he actions of political subdivisions of the state, such as the City . . . , and the effects of such actions are outside the scope of the [Cartwright] [A]ct." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 323 [216 Cal.Rptr. 718, 703 P.2d 58].) Accordingly, there is no basis for viewing *Freitas* other than as established precedent holding the Cartwright Act inapplicable to action of the City such as is involved in this case.

■ Finally, we summarily reject Penn's apparent suggestion that since Business and Professions Code section 16702 refers to "corporations" as within its ambit, this should be read to include "municipal corporations." The quoted terms obviously are of separate and distinct meaning.

---

[6]There is no substantive similarity between *Willis* and *Freitas* in *Willis*'s reliance on a section not within the Cartwright Act, of which *Cianci* disapproved as follows: "Second, the [*Willis*] opinion's use of section 16600 as an aid to the construction of the Cartwright Act is unconvincing. The opinion declares: 'It is significant that, in related legislation added to the Business and Professions Code at the same time as the Cartwright Act, the word "profession" was included among the terms describing the scope of the legislation, notwithstanding the fact that the words "trade" and "business" were also used. [Citation.] The difference in terminology between this section and the Cartwright Act may be viewed as indicating that the act was not intended to apply to the professions.' (58 Cal.2d at p. 809.)

"On closer examination, however, the two code sections are not sufficiently related to support the result the opinion reaches. 'Section 16600 . . . was first enacted in 1872 and was placed at section 1673 of the Civil Code. On the other hand, section 16720 . . . was first enacted in 1907 as part of the then uncodified Cartwright Act and was patterned after the federal Sherman Act, with identical "trade or commerce" language . . . . [¶] The California Business and Professions Code came into existence in its present general form in 1937. The relevant portions of the Cartwright Act and Civil Code section 1673 were moved into this, then new, codification in 1941. It is significant that these two code sections were not *new* enactments *"added"* to the Business and Professions Code in 1941. Rather, they were the result of the Legislature engaging in statutory consolidation. Under these circumstances, a finding of legislative intent to exclude the professions from the Cartwright Act, based upon nothing more than language differences between the two code sections, exceeds the limits of plausible inference.' (*Willis Reexamined, supra,* 7 Western St. U. L.Rev. at pp. 102-103, italics in original, fns. omitted.)" (*Cianci, supra,* 40 Cal.3d at pp. 921-922.)

Since we have concluded we shall follow the *Freitas* holding that cities are not subject to suit under the Cartwright Act, it is unnecessary to address Penn's further argument that the City's action violates the Cartwright Act.

Judgment affirmed.

Wiener, Acting P. J., and Butler, J., concurred.