[No. A033077. First Dist., Div. One. Aug. 24, 1987.]

ROBERT WALKER et al., Plaintiffs and Respondents, v.
JOHN J. MEEHAN, as District Attorney, etc., Defendant and
Appellant;
CITY OF EMERYVILLE, Defendant and Respondent;
ROBERT R. OLSON et al., Interveners and Respondents.

1292

**COUNSEL**

John J. Meehan, District Attorney, and Colton C. Carmine, Deputy District Attorney, for Defendant and Appellant.

No appearance for Defendant and Respondent.

David F. Offen-Brown, Alexander, Millner & McGee, Patrick W. Coyle, Ernst & Coyle, John A. Burgess and Diane Schneider for Plaintiffs and Respondents and for Interveners and Respondents.

Elwayne E. Smith, City Attorney (Huntington Park), Wildman, Harrold, Allen, Dixon, Barash & Hill, Jerry M. Hill, Kenneth W. Kossoff, Brendon Brady, Brady & Ford, Simke, Chodos, Silberfeld & Anteau, David Manning Chodos, Richard A. Ford, Peter Wallin and Wallin, Kress, Reisman, Price & Dilkes as Amici Curiae.

## OPINION

**RUSHING, J.**\*—This is an appeal by the District Attorney of Alameda County from an order of the superior court granting a preliminary injunction which prevented any interference with the playing of the game of Pai Gow in licensed cardrooms. In light of our agreement with the decision in *Sullivan* v. *Fox* (1987) 189 Cal.App.3d 673 [235 Cal.Rptr. 5], we reverse the order.

### *Factual and Procedural Background*

Respondents are the owners of licensed card rooms in the City of Emeryville. Penal Code section 330 prohibits "gaming," which is defined as the playing for value of 12 enumerated games and "any banking or percentage game played with cards, dice, or any device . . . ."[1] Games not prohibited by statute may be regulated by municipalities. (*In re Hubbard* (1964) 62 Cal.2d 119, 125-127 [41 Cal.Rptr. 393, 396 P.2d 809], overruled on another point in *Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 63, fn. 6 [81 Cal.Rptr. 465, 460 P.2d 137].) The City of Emeryville has not banned the playing of games which are not prohibited by state statute, but regulates card rooms by local ordinance.

When respondents learned of a decision of a superior court in Los Angeles which determined that the Chinese game of Pai Gow, when played in a

---

\*Assigned by the Chairperson of the Judicial Council.

[1] Section 330 provides in its entirety: "Every person who deals, plays, or carries on, opens, or causes to be opened, or who conducts, either as owner or employee, whether for hire or not, any game of faro, monte, roulette, lansquenet, rouge et noire, rondo, tan, fan-tan, stud-horse poker, seven-and-a-half, twenty-one, hokey-pokey, or any banking or percentage game played with cards, dice, or any device, for money, checks, credit, or other representative of value, and every person who plays or bets at or against any of said prohibited games, is guilty of a misdemeanor, and shall be punishable by a fine not less than one hundred dollars ($100) nor more than one thousand dollars ($1,000), or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment."

specific manner, was not a banking or percentage game, they approached the Emeryville Chief of Police to discuss their intention to offer the game of Pai Gow in their card rooms. On January 24, 1985, Chief of Police Joseph Maltby gave "provisional" approval to the request to play Pai Gow, subject to the issuance of legal opinions on the issue by the Attorney General's office and the district attorney.

Respondents engaged new employees and trained them in the rules of Pai Gow and, in some cases, expended funds in refurbishing the clubs to accommodate the playing of Pai Gow. Thereafter, respondents offered the game of Pai Gow at their establishments in accordance with the rules of play described in the Los Angeles Superior Court order.[2]

In late April of 1985, the Attorney General issued a letter which concluded that Pai Gow was only illegal when played as a banking or percentage game. The letter defined a banking game as "[a] game conducted by one or more persons where there is a fund of money offered and against which everyone has a right to bet. The fund is ready to be staked on all bets others may choose to make against the banker; the banker is responsible for payment of all funds, taking in all that is won and paying out all that is lost; the fund is called the bank and a person who conducts the game is called the banker." The letter also stated that rotation of the bank among the players would not eliminate the banking element of the game. A percentage game was defined as one where the house has an interest in the outcome of the game through the taking of an amount of the winnings or collecting only when there is a winner.

---

[2] The order described the game as follows: "(a) The game of 'Chinese' Pai Gow is played with domino-like tiles.

"(b) In each round of play, there is one hand out of eight maximum hands dealt which is designated as the dealer hand.

"(c) A minimum wager of $10.00 may be required of each participant, with no other minimum wager required of the participants.

"(d) A minimum wager of $10.00 may be required of the participant designated to receive the dealer hand for a given round of play, with no other minimum wager required by the dealer hand. In any given round of play, the participant designated to receive the dealer hand is required to place a fixed wager.

"(e) The dealer position continually and systematically rotates amongst each of the participants.

"(f) Plaintiff does not participate whatsoever in the actual play of the game, and has no interest in the outcome of play.

"(g) Plaintiff charges a rental fee from the participants based upon the amount each participant wagers. At no time does Plaintiff place bets, collect winnings or pay losses.

"(h) A round of play terminates either when all participants' hands are played and wagers are settled, or when the dealer position wins or loses the amount it wagered, whichever occurs first. Thus, in any given round of play, anywhere from only two hands to all eight hands dealt will actually be played.

"(i) No participant ever plays against or makes a wager against Plaintiff."

On May 15, 1985, Police Chief Maltby received a consultant's report from Donald Moore of the San Jose Police Department. Mr. Moore had conducted an on-site investigation of the method of playing Pai Gow in Emeryville, and concluded that the Emeryville game was an illegal banking and percentage game. Assistant District Attorney Richard Iglehart also informed Chief Maltby that he had observed the game in Emeryville and had determined that it was both a banking and percentage game.

On May 31, 1985, the owners of the Social Club, the Bank Club, and the Key Club filed an action for declaratory relief against the district attorney and the City of Emeryville in the Alameda County Superior Court seeking a judicial determination that the game of Pai Gow, as played in Emeryville, was not a banking or percentage game. On June 6 at a city council meeting, the district attorney stated that persons playing Pai Gow in Emeryville would be arrested beginning June 11, 1985.

On June 11, 1985, the respondents filed a first amended complaint which added a cause of action requesting an injunction restraining the city and county authorities from closing the cardrooms and arresting customers until the validity of the threatened application of Penal Code section 330 was determined. The court refused to issue a temporary restraining order. The evidence conflicts as to whether or not some clubs stopped playing Pai Gow at this time. It is undisputed that the Key Club continued to play. Changes were made in the manner the game was played to eliminate the banking aspect of the game, by having individual players play against each other. Other changes were made to eliminate what was perceived to be the percentage aspect of the game. The declaration of Randall Horton of the Emeryville Police Department states that the Key Club began charging table rent at a rate of $2 for 10 minutes of play, and no longer took a percentage of the "winning pot." The declaration of Bruce Lovick, manager of the Key Club, states that the club, at some point in time, utilized the same schedule discussed in the Los Angeles Superior Court order, with the substitution of a straight 5 percent fee collected from the amounts wagered. The Los Angeles schedule provided for a different charge based upon the amount bet, ranging from $1 for bets of $10 to $25, with a maximum of $80 for bets of $1,501 to $2,000. Lovick offered to use the Los Angeles schedule if the police objected. Police officers observing the games, however, determined that the rules had again been changed and that the house was collecting a percentage from winnings and was acting as the bank. On June 17, the Emeryville police at the Key Club arrested all participants in a Pai Gow game, as well as the club manager and house dealer.

On July 1, 1985, a hearing was held on respondents' request for a preliminary injunction. On July 8, 1985, the superior court filed its order granting a

preliminary injunction enjoining the district attorney "from preventing, or otherwise interfering," with the playing of Pai Gow and specifically finding that Pai Gow, when played as described in the court's order, was not a banking or percentage game. The order stated that a rental fee could be collected from a player's winnings, the amount wagered, or for the time that each participant played.

On August 15, 1985, this court denied a petition for writ of mandate filed by the district attorney. On August 16, 1985, the superior court filed its order in intervention allowing the owner of the Sands Club to file a complaint in intervention. On August 16, 1985, the district attorney filed a notice of appeal from the order granting the preliminary injunction.

On January 30, 1987, after briefing was completed in this appeal, Division Four of this district filed its opinion in *Sullivan* v. *Fox, supra,* 189 Cal.App.3d 673. *Sullivan* involved an order of the San Mateo County Superior Court that was identical to the preliminary injunction order in this case.[3] The *Sullivan* opinion analyzes the language of Penal Code section 330 and concludes that a banking game is a game that is played with the house as a participant in the game, taking on all players, and paying all winnings and losses from the "bank." The court also defined a percentage game as any game in which the house collects money calculated as a portion of the wagers made or sums won in play.[4] When fees for use of space or facilities are calculated upon the amount of time a participant plays, it does not convert the game to a percentage game. Apparently, the evil sought to be controlled by section 330 is the house having an interest in the game, whether through acting as banker or taking a percentage of the wagers. *(Id.,* at pp. 678-679; *People* v. *Ambrose* (1953) 122 Cal.App.2d Supp. 966, 970 [265 P.2d 191].)

Subsequent to filing of the *Sullivan* opinion, we granted the requests of respondents in this case to submit supplementary briefs on the issues raised by *Sullivan.* Among other points raised by the supplementary briefs, respondents argue that *Sullivan* renders Penal Code section 330 unconstitutionally vague.

---

[3] *Sullivan* notes that similar orders were entered in an action in San Joaquin County as well as the actions in Los Angeles, San Mateo, and Alameda Counties. *(Sullivan* v. *Fox, supra,* 189 Cal.App.3d 673, 676-677, fns. 2, 3.)

[4] Amicus City of Bell Gardens argues that this definition permits house participation in games with an advantage established by requiring an ante prior to play or other type of "built in" percentage. This argument ignores the clear statement in *Sullivan* prohibiting the collection of any "percentage" from the "bets made, winnings collected, or the amount of money changing hands." *(Sullivan* v. *Fox, supra,* 189 Cal.App.3d 673, 679.) We read this language as a prohibition on *any* percentage taken from the wagers, whether by altering the odds, assessing a direct charge computed on the amounts wagered, or taking a percentage of such amounts.

## Discussion

The only issue initially argued by the parties to this appeal is the trial court's jurisdiction to issue an injunction which interferes with the enforcement of a criminal statute. (Code Civ. Proc., § 526, 2d subd. 4; Civ. Code, § 3423, subd. Fourth.)

■ "As a general rule an injunction will not be granted to protect a person from prosecution for the alleged commission of a criminal offense on a showing that he is not guilty of such offense or that the law does not apply to him. The court having jurisdiction over criminal offenses is the forum in which such questions of fact must be determined. [Citations.]" (*Pitchess* v. *Superior Court* (1969) 2 Cal.App.3d 644, 648 [83 Cal.Rptr. 35].) Although there are several exceptions to this general rule, we do not find it necessary to address the issue at this time. (See 6 Witkin, Cal. Procedure (3d ed. 1985) Provisional Remedies, § 272, pp. 234-235.)

As the *Sullivan* case has determined the ultimate legal issue in this case adversely to the card clubs, the issue regarding the propriety of the injunction is moot if we agree with the *Sullivan* court's construction of the statute. We proceed, therefore, to a discussion of *Sullivan*.

### Definition of "Banking or Percentage" Game

Respondents and amici supporting their position urge us to depart from *Sullivan* to hold that a percentage game is not merely a game in which the house deducts a percentage from the wagers, but must involve house participation in the game. We have independently researched and analyzed the issues, however, and find ourselves in agreement with the conclusions of the *Sullivan* panel. Several of the arguments raised in this appeal are discussed in *Sullivan*; thus, respondents and amici argue that the doctrine of *ejusdem generis* requires a different definition of "percentage game," that the words are used as a term of art known in the gambling industry, that legislative history indicates a different definition, and that the definition is a fact question. Respondents also attack *Sullivan* as causing impermissible vagueness in the application of a penal statute. We discuss each of these contentions.

### Ejusdem Generis Does Not Apply

■ "The doctrine of *ejusdem generis* is sometimes applied in the interpretation of general words which follow specific words: The general words are limited to matters similar to those specifically stated." (1 Witkin, Cal. Crimes, *supra* , Introduction, § 15, pp. 17-18.) Respondents urge the appli-

cation of this doctrine to argue that the term "percentage game" applies only to games with characteristics similar to the specifically enumerated games in Penal Code section 330. The *Sullivan* opinion discusses this contention and correctly concludes that the doctrine of *ejusdem generis* will not be applied to defeat legislative intent. (*Sullivan* v. *Fox, supra,* 189 Cal.App.3d at p. 681.) We note also, that to the extent the doctrine results in a strict construction of the statute, it has been abolished in California. (Pen. Code, § 4; 1 Witkin, Cal. Crimes, *supra,* Introduction, § 15, p. 17.) We conclude that the doctrine has no application in this case.

### *"Percentage Game" as a Term of Art*

■ Once again, we agree with the *Sullivan* panel's discussion of the contention that the words "percentage game" have no particular technical meaning in the gambling industry. We also add that if there is a special meaning of the words, that meaning is the same as the definition in *Sullivan*. Our attention is called to a definition offered by John Scarne, an author of several books about card games and gambling, to the effect that a percentage game is a banking game in which the house obtains a favorable advantage by altering the odds. (See *Sullivan* v. *Fox, supra,* 189 Cal.App.3d at p. 681.)[5] Even if this partial quotation from what must be considered inadmissible evidence could be considered (see, e.g., *People* v. *Gosset* (1892) 93 Cal. 641, 646 [29 P. 246] [book called "Modern Pocket Hoyle" not admissible as evidence of the definition of the game of Faro]), we find that Scarne himself, in a different edition of the same book, supports the *Sullivan* definition. Respondents cite the 1961 edition of Scarne's Complete Guide to Gambling as stating that an honest gambling operator may obtain a percentage, or advantage over the player by assessing a direct charge or extracting a "favorable P.C. (percentage) on each wager." We read this definition of percentage as referring quite clearly to *any* charge that is taken out of the wagers without regard to house participation.

This construction is not contradicted by the out-of-state cases cited by respondents. For example, *McCall* v. *State* (1916) 18 Ariz. 408 [161 P. 893], cited for the proposition that a stakeholder for horserace betting who took a 10 percent fee was not engaged in a percentage game, did not so hold. The *McCall* court determined only that the parimutuel machine itself was not a "device" used in the conduct of a banking or percentage game because the machine itself did not determine the outcome of the wager. Interestingly, the concurring and dissenting opinions in *McCall* noted the difficulty in drafting gambling statutes because gamblers are ingenious in devising ways

---

[5]The issue of the definition of a banking game has not been raised in this appeal. The definition is well settled, however, and is discussed in *Sullivan* v. *Fox, supra,* at page 678.

to evade the letter of the law when only specific games are prohibited. (*Id.,* at pp. 895, 899.)

In a similar vein, the case of *Territory* v. *Jones* (1908) 14 N.M. 579 [99 P. 338], which involved a slot machine, is cited to support the argument that a percentage game is one involving unequal odds in favor of the owner of the game. Respondents claim that this inequality does not occur when odds are not given and the house merely collects a fee from the wagers made. We note, however, that the case of *United States* v. *Gerhart* (S.D. W. Va. 1967) 275 F.Supp. 443, which concerned a state statute prohibiting games of "unequal chance favoring the proprietor of the house," described the manner in which a slot machine operates as retaining a percentage of all money inserted. (*Id.,* at pp. 449-450.) Thus, it seems that "merely" retaining a percentage of the amount bet involves unequal chance, and fits the definition of a percentage game under the very cases cited by respondents.[6]

We do not agree that there is a known trade definition of the term "percentage game" which requires house participation in the game or limits

---

[6] A compelling illustration of the advantage obtained by a club that retains a percentage fee over the club that merely levies an hourly charge is contained in another of Mr. Scarne's books. (Scarne, Scarne's Guide to Modern Poker (1980) pp. 34-35.) We quote: "In the licensed Poker clubs of California the operators charge a fee for playing on an hourly basis which usually averages about $5 per person. This pays the operator's overhead, salaries, taxes, etc., and earns him a profit. Since Poker gets a lot of play it is sometimes quite a lot of profit: one of the California Poker palaces nets more than $3 million a year—which is not peanuts." (*Id.,* at p. 34.)

Regarding the effect of a 5 percent house "cut" of the wagers made, Scarne explains as follows: "I recently clocked twenty different Stud games for a period of two months. The maximum betting limits ranged from a low $2 to a high of $600. When I averaged my figures I found that:

"1. It takes about 1½ minutes to play an average hand.

"2. In a fast Stud game approximately forty hands are dealt per hour.

"3. The average pot in an eight-handed $4-limit game contains about $30 on the showdown.

"Now let's see how strong the 5% cut can be in this average game. Forty $30 pots per hour means that the operator's 5% cut gets him $60 per hour. In a session lasting six hours the operator takes a total of $360.

"Let's assume that each player began with $100 and that he received the number of good, bad and indifferent hands that probability says he can expect in the long run. The total money the players had at the game's start was $800. The total cut is $360, leaving only $440 in the game. Each player has paid the operator $45 of his original hundred. That small 5% cut has accumulated to 45%.

"Suppose the game continues and lasts for ten hours, as many Stud games do. If, by that time, six players have gone broke, leaving only two, these two will have only $200 between them. The operator has taken a charge of $600 out of the original $800. That deceptively small 5% cut has taken 75% of the total amount the players brought into the game!" (*Id.,* at p. 35.) Mr. Scarne's hypothetical indicates the reason that the respondents would prefer to charge a percentage of the amount bet. It also clearly illustrates the advantage obtained over the bettors by the club that collects a percentage fee.

the definition to a subspecies of banking games. Although many banking games are, due to the desire of the house to make a profit, also percentage games, we find no such limiting condition applicable to Penal Code section 330.

### Legislative History

■ Amici favoring respondents' position argue that the many additions to the section 330 listing of specific games, all of which are banking games, exhibit a legislative intent that only games which are similar to those listed were intended to be prohibited.[7] These games, amici argue, all involve participation by the house on an unequal basis. This is a variation of the argument that the doctrine of *ejusdem generis* limits the meaning of the statute. We believe, however, that there are two legislative events in the history of section 330 which compel a different conclusion.

As discussed by the *Sullivan* court, the section as enacted in 1872 prohibited six specific games or "any banking game." An amendment in 1885 added five additional games, and the words "or percentage" after the term "any banking." (Stats. 1885, ch. 145, § 1, p. 135.) If, as respondents and one amicus contend, a percentage game was meant to be included as a subspecies of a banking game, this addition would have been unnecessary, for there could be no separate percentage games. It seems likely that the arguments respondents make today to support the extraction of a percentage of the wagers illustrate the precise reason why the word "percentage" was included as a separate category in the statute. The Legislature must have intended that the house not link its profits to the profits derived from gambling, whether or not it participated as the banker.[8]

The second legislative indication that banking and percentage games were intended to describe two categories is the deletion of the word "other"

---

[7] Some amici have taken issue with a statement in *Sullivan* to the effect that the elimination of commercial gambling is a legitimate object of section 330. *(Sullivan* v. *Fox, supra,* 189 Cal.App.3d 673, 679.) Referencing the many forms of legalized gambling in California, they argue that this statement is erroneous and invalidates the philosophical basis of the opinion. We do not attach this degree of importance to the referenced statement and find it is merely an indication that regulation of commercial gambling is a permissible legislative objective. This has no impact on gambling activity the Legislature has chosen not to prohibit.

[8] Recalling the language of *McCall* v. *State, supra,* 18 Ariz. 408 [161 P. 893], we note that the ingenuity of gamblers makes it necessary to utilize more general language in gambling statutes. This desire to avoid the letter of the law was not confined to Arizona gamblers, as is evidenced by early opinions of the California Attorney General on a similar subject. In response to a query as to whether eliminating both the banking and percentage aspects from the game of "hokey-pokey" would legalize it, a 1903 opinion concluded that since hokey-pokey was a specifically listed game, it was illegal whether or not it was played as a banking game or a percentage was taken out. The query noted that gamblers had devised the practice of rotating the bank in an attempt to circumvent the law. (Cal. Atty. Gen. opn. No. 914, Nov. 28, 1903; see also 9 Ops.Cal.Atty.Gen. 108 (1947).)

in the 1885 amendment, which originally read "any other banking or percentage game." We agree with the *Sullivan* panel that the deletion of that word indicates an intent to establish a distinction between the listed games and the two subsequent general descriptions of prohibited games. We agree with the *Sullivan* panel's conclusion that the legislative history of section 330 compels the conclusion that the descriptive words establish separate and distinct categories.

This conclusion is not altered by the argument of another amicus that the house can participate and take a percentage of the wagers without acting as banker. This explanation solves the problem of relegating the term "percentage" to a subsidiary component of a banking game. It does not explain, however, why the Legislature would make it illegal for the house to take a portion of the wagers when it participates in the game but legalize such a percentage taken by a nonparticipating proprietor. The same problem of having an interest in the betting arises whenever the house derives its income from the money wagered. If the Legislature intended to create a distinction between a "participating" percentage and a "nonparticipating" percentage, it could have so specified in the statute.

### Definition of the Prohibited Games Is Not a Question of Fact

Citing *In re Benson* (1985) 172 Cal.App.3d 532 [218 Cal.Rptr. 384], *In re Hubbard, supra,* 62 Cal.2d 119, and *People* v. *Mason* (1968) 261 Cal.App.2d 348 [68 Cal.Rptr. 17], some respondents argue that the definition of a percentage game is a fact question, to be determined after a trial. We disagree. *Hubbard* and *Mason* involved the factual question of whether a particular game was a game of skill or one of chance, which was prohibited by the ordinance in question. The *Hubbard* court specifically defined the term "game of chance," but stated that whether the game in issue fell into that category was a question of fact. *(In re Hubbard, supra,* 62 Cal.2d at pp. 121-123.) The *Benson* court stated that the definition of a specific game is a question of fact. *(In re Benson, supra,* 172 Cal.App.3d at p. 537.) None of these cases stated that the definition of "banking or percentage game" is a question of fact. This determination is, without question, one of law. *(People* v. *Carroll* (1889) 80 Cal. 153, 157-158 [22 P. 129]; *People* v. *Gosset, supra,* 93 Cal. 641, 645-646; *People* v. *Ambrose, supra,* 122 Cal.App.2d Supp. 966, 969-970.)

### Constitutionality of the Sullivan Definition

The respondents argue that the *Sullivan* definition of a percentage game is so vague as to violate principles of due process by failing to give adequate warning of the nature of the conduct that is illegal. We note that a

statute need only be sufficient to "advise a person of common and ordinary intelligence what games are prohibited and what games are permitted . . . ." (*In re Hubbard, supra,* 62 Cal.2d 119, 122.) In considering a vagueness challenge to a statute which prohibited activity which "openly outrages public decency," the court in *In re Davis* (1966) 242 Cal.App.2d 645 [51 Cal.Rptr. 702] stated that the fact that different interpretations of the statute were possible did not render it unconstitutionally vague. (*Id.,* at p. 652.) The *Davis* court enumerated the sources which the judiciary should examine to determine the correct meaning of a statute when the language itself is not sufficiently specific. These sources include the legislative history or purpose of the statute, a settled common law meaning, possible technical meanings, and judicial decisions. (See also *Pryor* v. *Municipal Court* (1979) 25 Cal.3d 238, 246 [158 Cal.Rptr. 330, 599 P.2d 636].)

In this case, in addition to the judicial decisions discussed in this opinion and the legislative history of the amendment to include the word "percentage" in the statute, we note the citation in *Sullivan* of the Nevada case of *Hughes Properties, Inc.* v. *State* (1984) 100 Nev. 295 [680 P.2d 970], in which the court defined percentage games as those where the house takes a percentage of each wager as a "rake-off." (*Id.,* at p. 971.)[9] The 1922 edition of Corpus Juris as well as the current edition of Corpus Juris Secundum define the term "rake-off" as "a portion of the stakes, having the same meaning, it seems, as the term 'kitty'." (27 C.J., Gaming, § 47, p. 976; 38 C.J.S., § 1, p. 48.) "Kitty" is defined as: "In poker and other card games, the kitty is a part of the pool set aside for expenses; also a receptacle in a poker table into which a certain number of chips are dropped, when a hand of a certain value is held by a player, the contents of which, at the close of the game, go [to] the proprietor of the gambling establishment." (27 C.J., *supra,* § 40, p. 975, fns. omitted; 38 C.J.S., *supra,* § 1, p. 46.) Thus, as early as 1922, a standard reference work agreed with the *Hughes* definition of "percentage," an amount derived from the funds being wagered.

Some respondents argue that the average person is more likely to derive his or her understanding of the term "percentage" from the previously discussed book by author John Scarne as a "banking game in which a favorable advantage is obtained through offering less than correct odds." As previously noted, however, even Scarne does not limit the definition to banking games, stating in another edition of the book, that "percentage" is the advantage the operator of a gambling game obtains over the bettors. This advantage can be assessed as a *direct charge against the wagers* as well

---

[9] Contrary to the arguments of the parties, *Sullivan* did not rest its decision on *Hughes,* but merely mentioned it in passing as additional support. We agree that *Hughes* was a tax case based upon unrelated policy considerations, but believe that its importance in the *Sullivan* analysis was minimal.

as in an indirect manner by altering the payoff of the winners. We believe that the common element in every definition of the term "percentage" is that its calculation is based upon the amounts wagered. It is this factor which was isolated by the *Sullivan* court as the object of the prohibition of Penal Code section 330.[10] The prohibition of section 330 has a meaning which sufficiently advises persons of ordinary intelligence that games which are conducted as banking games are illegal, as are games in which the house deducts a percentage from the amounts wagered. *(In re Hubbard, supra,* 62 Cal.2d 119.)[11]

We note also that the respondents in this action cannot claim to have been uncertain about the district attorney's construction of the term "percentage game" subsequent to the issuance in April of 1985 of the Attorney General's letter opinion stating that, if Pai Gow were played as a banking or percentage game, it would be illegal. In that letter, it was specifically stated that, at a minimum, a percentage game was one in which the card club took a fixed amount of a player's winnings or collected only if there was a winner, or had an interest in the outcome of the game. The declaration of Detective Sergeant Horton of the Emeryville police stated that the Key Club at one time eliminated the percentage aspect of the game by charging a fee based upon the amount of time the game was played. This indicates an understanding of the definition subsequently enumerated in *Sullivan.* In fact, it seems that the contention of respondents that this definition was wrong is what prompted the instant action. Thus, the *Sullivan* definition cannot be said to be unexpected or indefensible in reference to previously existing law. (See, e.g., *People* v. *Sobiek* (1973) 30 Cal.App.3d 458, 474 [106 Cal.Rptr. 519, 82 A.L.R.3d 804], cert. den. *sub nom. Sobiek* v. *California* (1973) 414 U.S. 855 [38 L.Ed.2d 104, 94 S.Ct. 155] [judicial construction of statute does not infringe on right to fair warning that conduct is criminal where construction is not an unexpected judicial enlargement of criminal law]; *Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 635 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420].)[12]

---

[10]We also note that the *Sullivan* definition of "percentage game" does not make Pai Gow or any other legal games, such as poker, illegal. Many games can be played as banking games or without the banking element. (See, e.g., 9 Ops.Cal.Atty.Gen. 108, *supra.*) We perceive that the same is true of the inclusion or deletion of the percentage element of a game.

[11]Amicus Huntington Park Club Corporation suggests that a citizen might be unable to determine whether a game offered in a particular establishment was being conducted as a percentage game, thus rendering the statute unconstitutionally vague. We have no such party before us in this appeal, however, and decline to review that question at this time.

[12]Other card clubs apparently assess charges based upon the amount of time the game is played; thus, this practice is not novel. (See, e.g., *Penn* v. *City of San Diego* (1987) 188 Cal.App.3d 636 [233 Cal.Rptr. 514].) The contention of amicus City of Bell Gardens that such per-hour charges may not be fair should be addressed to the Legislature.

We conclude that the *Sullivan* definition is not unconstitutionally vague and that it is supported by legislative history as well as commonly accepted definitions of the term "percentage game."

### *Issuance of the Preliminary Injunction*

■ The grant or denial of a preliminary injunction is a matter for the discretion of the trial court. *(California Satellite Systems, Inc.* v. *Nichols* (1985) 170 Cal.App.3d 56, 63-64 [216 Cal.Rptr. 180].) The trial court must consider the likelihood that the plaintiffs will prevail on the merits, and balance the harm the plaintiffs might suffer while the action is pending against the harm to the defendant if the injunction is issued. *(Cohen* v. *Board of Supervisors* (1985) 40 Cal.3d 277, 286 [219 Cal.Rptr. 467, 707 P.2d 840].) ■ In this case, respondents have conceded that they collected a percentage of the winning bets as their fee. We have determined that the trial court used an incorrect legal standard in weighing the likelihood that the cardrooms will prevail on the merits. In light of this fact, and the concessions of the parties, we must conclude that the trial court abused its discretion in granting the preliminary injunction as, in light of the construction of section 330 explained herein, no reasonable possibility remains that the cardrooms could prevail on the merits of this action.

### *Disposition*

The order granting the preliminary injunction is reversed. Appellant is entitled to costs on appeal.

Holmdahl, J., concurred.

**NEWSON, Acting P. J.,** Dissenting.—Wherever, as here, an activity not in itself evil, but morally neutral, is proscribed as criminal, a criminal intent separate from the mere doing of the forbidden act must be established in order to prove commission of a crime.

Gambling is, of course, a morally neutral act, a fact which, if we did not know it as a matter of common sense and experience, we would deduce from the state's own active participation in gambling schemes which make Pai Gow seem a conservative investment by comparison.

Yet neither I, nor the Legislature, nor to the best of my knowledge "men of common intelligence" (cf., *Lanzetta* v. *New Jersey* (1939) 306 U.S. 451, 453 [83 L.Ed. 888, 890, 59 S.Ct. 618]) can say with the reasonable certainty required by law what is a "percentage" game as proscribed by Penal Code section 330.

For that reason, I am of the opinion that Penal Code section 330 is void for vagueness, in that it does not adequately or reasonably define the conduct sought to be prohibited, and in a manner that does not encourage arbitrary and discriminatory enforcement. (*Kolender* v. *Lawson* (1983) 461 U.S. 352, 357 [75 L.Ed.2d 903, 908-909, 103 S.Ct. 1855]; *Hoffman Estates* v. *Flipside, Hoffman Estates* (1982) 455 U.S. 489, 498 [71 L.Ed.2d 362, 371-372, 102 S.Ct. 1186].)

It follows that I believe it reasonably likely respondents will succeed at trial on the merits and that, finding no abuse of discretion in issuance of the preliminary injunction, I would leave it undisturbed.